MIDDLETOWN SAVINGS BANK *vs.* FRANCIS FELLOWES AND ANOTHER.

*S*, the owner in fee of a house and lot, contracted to sell it to *B*, and *B* in like manner to *F*. While the ownership was in this condition, the public records showing only a title in *S*, who remained in possession, *F* employed a builder to make extensive repairs and alterations of the house, out-buildings and fences. The builder, with the consent of *S*, went upon the premises and began work. About three weeks later *S*, *B* and *F* met, and *S* made a conveyance directly to *F*, and *F* at the same time and as part of the same transaction made a mortgage of the premises, free from encumbrance, to a savings bank for a loan of money, the bank having no actual knowledge of any claim of lien on the part of the builder, and the mortgage being made under a previous agreement of *F* to make it on his acquiring the title. Held that the savings bank acquired a lien that took precedence of the lien of the builder. (Two judges dissenting.)

The builder had at the time done no work upon the house, but had brought a considerable quantity of lumber upon the premises, and had begun to build a fence around the lot. Whether this was sufficient to establish a lien : *Quœre.*

The builder had undertaken the work upon an oral contract, and the work finally done was far more extensive than was expected by either party at the outset. Whether, if the builder's lien had had precedence, it could have covered anything more than the work proposed to be done at the time the savings bank took its mortgage : *Quœre.*

It seems that the case was not affected by the fact that a committee of the savings bank examined the property with reference to the making of the loan, and that the premises were at the time in a dilapidated condition and a new fence was being built, and that the committee either saw, or by inattention failed to see, the work that was going on.

BILL to foreclose a mortgage; brought to the Superior Court in Middlesex County. The respondents were F. Fel-

lowes, the mortgagor, and Erastus Phelps, who claimed a prior builder's lien upon the property. The following facts were found by a committee:

On the 1st day of May, 1869, the premises in question were owned in fee by one Roswell C. Smith. H. & S. Bissell had previously contracted to purchase the property, and had obtained from Smith a written contract or bond for a deed. They were to pay for it in part by conveying to Smith a dwelling house worth about $20,000, and of which they had then delivered to him the possession, and the balance in cash on the delivery of the deed. After thus contracting for the purchase of the property, H. & S. Bissell had sold it by bargain to the respondent Fellowes, and had given him a bond for a deed, dated September 19th, 1868. The time for the fulfillment of the contract on the part of Fellowes, originally limited by the bond, was extended from time to time until the 14th day of June, 1869.

On the 1st day of May, 1869, by the consent and permission of Smith, who was then in the possession of the premises and who remained in possession until June 12th, 1869, the respondent Phelps, under a parol contract with Fellowes, commenced furnishing materials for the construction and repairs of the buildings and fences. On that day he delivered on the premises 5064 feet of ceiling boards, about two-thirds of which were used in the construction of the fences, and the remainder in the construction of a barn on the premises. Those used in the barn were subsequently, and before using, removed from the premises for storage. This was rendered necessary by the fact that after commencing to repair the barn, it was decided to remove it, and build a new one.

On the 13th of May Phelps made a small charge for cartage, and on the 15th commenced labor by his employees, which continued from day to day until after the 12th day of June following. The labor prior to June 12th was on the fence, and up to that day the labor performed, and the materials furnished, amounted to about $800. The fence enclosed the whole premises, and was joined to the barn, the barn standing in the line of the fence.

No work had been done on the buildings up to June 12th, except that Phelps during that time on two occasions took levels for a drain leading from the dwelling house to the sewer, and finding that the drain was being laid too high, he directed it to be relaid and lowered, which was done. The drain was not laid by men in Phelps's employ, and it did not appear by whose request he performed that service. But it was done in behalf of Fellowes, and was beneficial to him as proprietor.

No specific charge was made for this work nor for any other service performed by him in person. His compensation was agreed to be a charge of fifty cents per day for each workman employed, and a commission not exceeding ten per cent. on his disbursements.

Phelps continued to furnish labor and materials for the buildings until November 29th, 1870. His certificate of lien was filed January 27th, 1871. There was no written contract between Phelps and Fellowes in respect to the work and materials, but there was an oral agreement, made before the commencement of the work, that the work should be done by the day, and that the materials should be furnished from time to time, as needed or requested.

There was no understanding as to the amount of labor to be performed, or materials to be supplied, but the same was to depend upon the directions given by Fellowes from time to time; but it was understood that the whole job was to be done by Phelps. The amount actually expended in work and materials was largely in excess of what either party anticipated at the commencement.

Before commencing the work Phelps made and furnished to Fellowes an estimate of the probable expenses of carrying out the plan as it then lay in the mind of Fellowes. The whole amount expended on the premises by Phelps, exclusive of interest, was about $33,000, of which about $3,600 was profit. Phelps supposed that Fellowes would acquire a good and unincumbered title.

On the 11th day of June, 1869, Fellowes having previously applied to the Middletown Savings Bank for a loan on the

premises, a committee consisting of the president and one of
the directors of the bank, visited and examined the property,
to judge of its value. On that day two men were at work on
the fence. The fence was nearly completed and new, but
the premises generally were in a dilapidated condition. The
condition of the buildings and fence, and the fact that work
was being done on the premises, were obvious and could
hardly have failed to attract the attention of any one who
was examining the property with reference to its value. Both
gentlemen however testified that they did not know that
any work was going on. But the committee found from all
the circumstances, either that they knew of the work at the
time, and had forgotten it at the time they testified, or else
that their not knowing of it was the result of inattention,
and therefore found that they had, knowledge, actual or con-
structive. They had no knowledge of the arrangement be-
tween Phelps and Fellowes, although they understood that
Fellowes intended to make extensive repairs.

On the 12th of June the deeds were delivered. The deeds
from Smith to H. & S. Bissell, and from H. & S. Bissell to
Fellowes, and the mortgage from Fellowes to the Middletown
Savings Bank, were delivered to the respective grantees, in
the order above named, and at the same interview; and the
avails of the loan were delivered by the bank to Fellowes,
and by Fellowes to the Bissells, and the Bissells paid a part
thereof to Smith, at the same time, the whole being substan-
tially one transaction.

All the deeds were taken to the town clerk's office for
record, by Mr. Camp, the treasurer of the savings bank, at
the same time. Mr. Camp knew, at the time he took the
mortgage deed, that the avails of the loan were to be used
by Fellowes to pay for the property mortgaged; but it was
not found that he or any other officer of the bank knew it
before.

The bank had already agreed, provided the title was satis-
factory, to make the loan, without any knowledge of the
purpose of Fellowes in taking the same, and without any
knowledge that the proceeds were to be applied in payment

to the Bissells. Mr. Camp brought the money to Hartford to make the loan on the day the same was made, without any such knowledge, and only learned of the application by being present when it was made. This application was not a condition of making the loan, and had no material relation thereto.

The officers of the bank had no knowledge of the title to the property until the 12th day of June, when Mr. Camp caused an examination to be made, and found that Mr. Smith had a good title, and that deeds from him to the Bissells, and from the Bissells to Fellowes, made a clear and unincumbered title in Fellowes on the records.

No officer of the bank had any actual knowledge of any claims of lien at the time the money was advanced; the bank however had such knowledge on that subject as may be implied from the facts herein stated.

The amount loaned by the savings bank was $30,000, in two notes, one of $20,000, secured only by the mortgage, and one of $10,000, secured by the mortgage, and also by the signature of Harvey Seymour as surety. The amount due to Phelps, with interest to the 1st day of January, 1875, is $39,666.89. The value of the property is $50,000.

Upon these facts the case was reserved for the advice of this court.

*Culver* and *C. E. Perkins*, for the petitioner.

1. The statute giving a lien to builders applies only to cases where the claim is against the owner of the property. This statute is to be strictly construed. *Chapin* v. *Persse & Brooks Paper Works*, 30 Conn., 474. The language is indefinite; any person who has a claim against *any one*, would be within its letter, but it has always been construed as intending only a claim against the owner, and the legislature in 1874 added a provision to this effect, which however was only declaratory. *Spaulding* v. *Thompson Ecclesiastical Society*, 27 Conn., 577. In section 11, the statute provides that sub-contractors shall not have a lien unless they give notice to the *owner*, and in section 12 it provides that the

liens all together shall not be valid to a greater extent than the whole sum agreed to be paid by the owner of the land and buildings. Such a construction was given to similar language in the statutes of Massachusetts and Maine with regard to mechanics' liens. *Thaxter* v. *Williams*, 14 Pick., 49; *Conner* v. *Lewis*, 16 Maine, 268. The only question therefore is, whether there was any thing in the relation in which Mr. Fellowes stood to the property from which the law will regard him as owner. It is claimed that because he had a contract for purchase from another person, who had another contract of purchase from the owner, this gives him such an interest in the property as enables him to create liens as if he were the legal owner. But it is most unreasonable to suppose that the statute intended to give to any person to whom I have, on certain conditions, agreed to sell my property, a right to expend money upon it in improvements, which are to become a charge on the property and which I may have to pay. While the owner retains the title to the property he and he only can incumber it. It would be as reasonable to say that Fellowes could mortgage the property as to say that he could create liens on it. The mechanic is bound to know or find out what the title of his employer is. He must show a valid *claim*, arising from a contract made with some person who has power to contract. Unless Phelps had a claim against Mr. Smith, the owner, he could have no lien even against him. But the case becomes very much stronger when we come to the case of a third person loaning money on the strength of the title. The owner knows when a contract to convey is made, but a creditor goes to the records, and he there finds what incumbrances are existing; and the only way in which he can find out anything about mechanics' liens is to go to the person whom the records show is the owner. If that person has created no liens, the creditor has no means of further information, and has a right to take it for granted that there are no liens.

2. It is believed that in no case like the present has a mechanic's lien been preferred to the mortgage. On the contrary it has been always held that a mortgage to secure the

purchase money, given at the time of the purchase, takes priority of liens for work done for the purchaser before he obtains the legal title, and this even where the purchaser was in possession.   One of the earliest cases is *Thaxter* v. *Williams*, 14 Pick., 49, in 1833.   It was exactly the case at bar, and it was held that a person in possession under a bond for a deed could not create a lien, and especially that a deed to him and a mortgage made at the same time to obtain the purchase money, did not give him such a seizin that the lien attached.   This case has never been overruled, but has been affirmed, and is held to be a leading case every where. In 1854 the case of *Metcalf* v. *Hunnewell*, 1 Gray, 297, was decided.   At that time the statute gave a lien to a mechanic if the work was done for any person who had contracted with the owner of the land for its purchase.   It was held that this did not extend to cover work done for a person who had contracted with *another* person who had a contract with the owner.   In 1870 the case of *Hayes* v. *Fessenden*, 106 Mass., 231, was decided, in which it was held that a person who had contracted for the purchase of land could not charge it with a lien, although the owner knew of the erection of the building and did not object to it.   *Campbell's Appeal*, 36 Penn. S. R., 247, is exactly in point.   A person contracting for the purchase of an estate, *and in possession*, erected buildings. When the contract was executed, at the same time and as part of the same transaction the land was mortgaged to a third person for part of the purchase money, and it was held that such a mortgage took precedence of the lien, as a matter of *equitable right*, as, without such mortgage, the mechanic would have had no interest in the property on which his lien could have attached.   See also *Stoner* v. *Neff*, 50 Penn. S. R., 258; *Zeigler's Appeal*, 69 id., 471; *Weldon* v. *Gibbon*, 2 Phila. R., 340; *O'Conner* v. *Warner*, 4 Watts & Serg., 227; *Conner* v. *Lewis*, 16 Maine, 268; *Gray* v. *Carleton*, 35 id., 481; *Bridwell* v. *Clark*, 39 Misso., 170; *Scales* v. *Griffin*, 2 Doug. (Mich.), 54; *Virgin* v. *Brubaker*, 4 Nevada, 31; *Guy* v. *Carriere*, 5 Cal., 512; *Underhill* v. *Corwin*, 15 Ill., 556; *Jersey Company* v. *Davidson*, 29 N. Jersey Law R., 415;

*National Bank* v. *Sprague*, 20 N. Jersey Eq. R., 14; *Harsh* v. *Morgan*, 1 Kansas, 293; *Kenny* v. *Gage*, 33 Verm., 302.

3. But Phelps's lien did not originate before our mortgage. All that he did was to build a fence, and to furnish material to repair the barn, *which material was afterwards removed from the premises.* Building a fence does not give a lien. It is not a *building*, or an appurtenance of a building. It is appurtenant only to the *land*. Webster defines "appurtenance" as "small buildings connected with the house, such as barn, wash-house," &c. Still less does the fact that a few hundred feet of boards were brought there to repair the barn, and then were taken away again when it was decided not to repair it, but to build a new one, make the whole of the work relate back to the time when the boards were first brought there. The fact that Phelps still *intended* to use them on the premises, makes no difference. It is the time when they are actually furnished for the construction that fixes the date. And it will hardly be claimed that because Phelps took a level to have a drain properly laid, that act gave him a lien. All such acts are much too small and immaterial to deprive us of our actual cash advance of thirty thousand dollars, being the whole amount of the purchase-money paid. We ought certainly to stand in as good a position as Mr. Smith, the owner; and can there be any question but that if he had sold, and taken back a mortgage for the purchase-money, his mortgage would have stood before the lien? There was no contract for building entered into between Fellowes and Phelps. It was only agreed that *when* the work was done the latter should do it by days' works. It was not expected or intended that work on the house should be commenced until after Fellowes had purchased the property and got possession.

*R. D. Hubbard* and *H. C. Robinson*, for the respondent Phelps.

The lien of Phelps must prevail unless the petitioners shall establish one of three things:—1st. That the mechanic's lien did not attach until after June 12th, because the labor and materials were not such as the statute protects; or 2d. That

it is subordinate to the mortgagee on account of an incidental application by the mortgagor of the money lent, toward paying for the premises; or 3d. That it did not attach at all, because there has never been sufficient estate for it to attach to, as against the mortgagee.

1.    The labor performed and materials provided before and on the 12th day of June were of such a character as to make a lien upon the premises. The place which Mr. Fellowes designed to occupy as his homestead was in decay, and its thorough reconstruction was determined upon, including an appropriate fence, the enlargement of the barn and stable, and the renovation of the dwelling house. For this entire job the skill and services of Phelps were engaged upon a commission. The magnitude of the contract can be seen by noticing that his disbursements amount to $33,000. The excess of the cost above the estimates is not strange. This is a common experience. The entireness of the contract is held to be significant in determining what is the subject of lien. *Yearsley* v. *Flanigan*, 22 Penn. S. R., 489. There have been cases which hold that fences about country lots are not included in the term " building," as they certainly are not in the term " dwelling-house." Though in Massachusetts it has been held that " building or structure " includes a city fence. *Rathbun* v. *Hayford*, 5 Allen, 406. But our statute includes not only buildings and dwelling-house, but " any of their appurtenances." There can be no doubt that a city fence, skirting the whole lot, and in a line with the face of the barn, and " adjoined to the barn," exhausting nearly 3,400 feet of ceiling boards, is to be included as an appurtenance of the dwelling-house and buildings repaired. In addition to the labor upon the fences Phelps also took levels for drains from the dwelling-house before the 12th of June, and also furnished, on the 1st of May, a large quantity of material, 5,064 feet of ceiling boards, about one-third of which went into the barn.

2.    The application which Mr. Fellowes happened to make of the money did not subordinate the lien of the mechanic to the mortgage. In this part of the case, the petitioners rely upon the supposed lien which has been, by some courts,

held to be in vendors for their purchase money, and which some of the courts have also said may continue where a mortgage is taken by the vendor, and may even pass over from the vendor to another who provides funds *for the purpose* of making the purchase. We submit that this principle has no force against the mechanic in this case, for two reasons.—1st. The doctrine of vendors' liens has found no especial favor in Connecticut. *Dean* v. *Dean*, 6 Conn., 288; *Meigs* v. *Dimock*, 6 Conn., 463; *Atwood* v. *Vincent*, 17 Conn., 583.—2d. If the doctrine were to be recognized here at all, we submit that it would not apply to a case like this. In the cases where the principle is recognized, and where the lien is held to accrue to the benefit of a third person advancing the purchase money, there has always been a previous purpose, on his part, to furnish the money for the purchase. And we submit that, neither by authority nor by logic, can it for a moment be claimed that any person who lends money and takes a mortgage upon the borrower's real estate as security, becomes possessed of a vendor's interest in the land, if only the mortgagor happens to apply the whole or some part of the loan in payment for the land. A lender is at liberty to accept such security as he pleases. In this case the petitioners took the security of the land as it was at the time the deed was delivered, and the additional guarantee of Mr. Seymour; if they had wished for an additional vendor's lien, they should at least have insisted that their funds should go to the purchase. But the court finds that this application of money had no *material relation* to the loan, and that the only knowledge which the agent of the company had of the fact was by his actual presence when it occurred.

3. There was sufficient estate to sustain the lien before the delivery of the mortgage. It is true that in one state, where the lien law ran only against the *owner* of the land, the court held the term to designate the owner of the legal estate. But we are not embarassed by any such limitation in our statute. The legislature dropped the word " proprietor " from the act, and has made the lien effectual to attach to any interest in the land. Mr. Fellowes's equitable estate at

the commencement of Phelps's services became merged in his legal estate on the 12th of June. In some states where the lien was only against " owners," the courts have held, in just such a case as this, that when the equitable estate in fact became afterward merged into the legal estate, the date of the attachment of the lien related back to the beginning of the services, when there was only the equitable estate. *Rollin* v. *Cross*, 45 N. York, 766. But at most such a claim as we are now considering could operate against us only to the extent of a few hundred dollars. The court has found that Phelps was at work on the very day when Mr. Fellowes received his deed, and if never before, his lien then attached, and the amount of his bill, less the $800 already expended, comes in before the mortgage. In this branch of the case it is not to be overlooked that conveyances of interests, merely equitable, in land, are protected by our statutes. Revision of 1875, tit. 18, sec. 13. Nor should we forget that notice of liens must be regarded by parties having to do with the land. *Boswell* v. *Goodwin*, 31 Conn., 84. And the finding shows that there was notice to these petitioners of the commencement of the improvements upon this property. The petitioners claim in this branch of the argument that the doctrine of instantaneous seisin excludes our right of lien, or at least subordinates it to the mortgage. But we insist that the doctrine applies only to cases where a single act or conveyance confers and divests the title; and that its application depends upon whether there is ever any *beneficial seisin* in the party. Blackstone (2 Com., 132,) illustrates it by the case of " the seisin of the husband for a *transitory instant* only, when the same act which gives him the estate conveys it also out of him again, as where by a fine land is granted to a man and he immediately renders it back by the same fine." The early cases in Massachusetts thus recognize the doctrine. Thus, in *Holbrook* v. *Finney*, 4 Mass., 568, which is a leading case upon the subject, Ch. J. Parsons says the seisin for an instant is where a party, by the same act by which he acquires the seisin, parts with it. The whole subject, as viewed by the courts of that state, is explained in the case of

*Hazleton* v. *Lesure*, 9 Allen, 24, where it is expressly admitted that if there is "*a beneficial seisin, however short,*" this doctrine does not apply. There must have been a beneficial seisin in Mr. Fellowes unless, at the time he received the deed, he received it upon some trust, or for some use other than his own. The principle is thus clearly stated by a modern text writer. " The settled doctrine is that when property passes through a man without his having paid for it and with *an understanding that he is at once to secure the payment* by a mortgage on the property itself, no right vests in him, except that which is subject to such payment." " The delivery of the deed and the delivery of the mortgage are but one transaction, done in performance of the same agreement. Their operation is contemporaneous and connected, and affords no opportunity for the liens of creditors to attach." Phillips on Mech. Liens, § 246. There is no intimation in the finding of any such trust or use. On the contrary they are both negatived by the finding that the application of the money had no relation to the loan. If the doctrines of vendors' liens and instantaneous seisin are to apply to conveyances which have only such an accidental relation, the mechanics' lien law will be a failure. If it shall be ruled that whenever the owner becomes invested with a perfect title and the mortgagee takes his deed of mortgage at the same interview, the builders and laborers are thereby deprived of the protection of this statute, then the statute is made unreliable except in cases of perfect title, which the statute most evidently did not contemplate or require. If the doctrine of a vendor's lien to its full extent is recognized by our courts, the mechanic is deprived of the protection of this most equitable statute against any mortgagee, no matter what the date of his mortgage, any part of whose loan is in fact, by accident or design, applied to the purchase of the property.

FOSTER, J. The contention in this case is as to priority of lien ; the plaintiffs claiming as mortgagees, and the defendant Phelps under a mechanic's lien for materials furnished and services rendered.

Middletown Savings Bank *v.* Fellowes.

The claim of each party is founded in the highest equity. The amounts involved are large, so large that the property, though found to be worth $50,000, is insufficient for their payment. We have endeavored to give the question that careful consideration which its importance demands.

On the 12th of June, 1869, the premises in question belonged, and for a long time previously had belonged, to the late Mr. R. C. Smith. On that day he conveyed the same to Messrs. H. & S. Bissell—they to Mr. Fellowes, one of the defendants, and he, by deed of mortgage, to the plaintiffs, as security for a loan of money then made by them to him. That money was used in payment for the property. These deeds of conveyance were all delivered on the same day, at one interview, and in the order here given. The committee finds that the whole was substantially one transaction. The deeds were all taken to the town clerk's office for record at the same time, by Mr. Camp, the plaintiffs' treasurer. The bank had previously agreed to make the loan, provided the title was satisfactory, without any knowledge that the proceeds of the loan were to be applied in payment for the property. Such application of the money was not a condition of making the loan, and though Mr. Camp knew that such application was to be made, at the time he took the mortgage deed, neither he, nor any other officer of the bank, knew it before. The examination of the title, on the 12th day of June, 1869, by Mr. Camp, showed that Mr. Smith had a good title; and the deeds from him to the Bissells, and from them to Fellowes, made a clear and unincumbered title in him on the record.

The Messrs. Bissell had made a contract to purchase the premises in question of Mr. Smith, some time prior to the making of the conveyance. And they had contracted to sell the premises to Mr. Fellowes, and had given him a bond for a deed dated September 19th, 1868.

On the 1st of May, 1869, by the consent and permission of Mr. Smith, who was then in possession of the premises, and who remained in possession till June 12th, 1869, Mr. Phelps, one of the respondents, under a parol contract with Mr. Fellowes, commenced furnishing materials for the construction

and repairs of the buildings and fences.   On that day a quantity of lumber was delivered on the premises by him for that purpose.   On the 13th of May, Mr. Phelps made a small charge for cartage, and on the 15th, he commenced work on the premises, which continued from day to day to the 12th of June following.   The labor done, prior to the 12th of June, was wholly on the fence which enclosed the lot; nothing was done on the buildings.   Mr. Phelps afterwards continued to furnish labor and materials for the buildings till November 29th, 1870.   The certificates of lien were filed January 27th, 1871.

The contract for the work and materials was wholly oral. There was no understanding as to the amount of labor to be performed or of materials to be supplied ; the same was to depend upon the directions of Mr. Fellowes, from time to time, but the whole job was to be done by Mr. Phelps.   The amount actually expended in work and materials was largely in excess of what either party anticipated at the commencement.

Which of these liens is now entitled to the priority?   We think that of the mortagees.   The principle is well established in this state, that our land records should show the title to real estate.   The experience of every year shows this to be a wise and salutary policy.   It has no doubt been impaired, to some extent, by our statute giving a lien to mechanics and material men, which statute of course is to be enforced according to its true intent and meaning.   That the records should continue to show the title to lands, is also a rule still to be enforced, unless there are controlling reasons to the contrary.

We think that these mortgagees, the present plaintiffs, on the 12th of June, 1869, on the delivery to them of the deed of Mr. Fellowes, took the title of Mr. Smith, who, up to that time, was well seized and possessed of the premises. It stands on the same ground, substantially, as though the deed had been given the plaintiffs directly from Mr. Smith himself.   There were, it is true, intermediate conveyances,,

but the committee finds that the whole was substantially one transaction.

That the plaintiffs, under these circumstances, supposed they had obtained the first lien on the property, and that their grantor, Fellowes, intended to give them such a lien, and supposed he had done so, cannot, we think, reasonably be doubted.  It is incredible that the plaintiffs would have loaned $30,000 on this property had they supposed that the defendant Phelps had already a lien upon it, which, when his work was finished, would amount to nearly $40,000.   To charge Mr. Fellowes with a design to give this mechanics' lien a priority to the mortgage is imputing to him a design to commit a fraud.  He must have known that the plaintiffs would not have made the loan except on the faith that he conveyed to them a clear unincumbered title, according to the covenants in his deed.   The case does not find that the money loaned was to be applied in payment for the property, but we think it does find that Mr. Fellowes received a clear title, and was to convey a clear title.

The claim of Mr. Phelps, being for materials furnished and labor done, is, as we have already remarked, one of the highest equity; but the lien for its payment must attach to the premises, subject to the lien created by the mortgage.  Mr. Phelps must be presumed to know, that on the 1st of May, 1869, when he commenced furnishing the materials and began work on the fence, Mr. Fellowes had no legal title to the property.   Indeed the case finds as much in the words—" Said Phelps supposed that Fellowes would acquire a good and unincumbered title."   Even his bond for a deed was not from Mr. Smith, the owner of the estate, but from the Messrs. Bissell, who had only a contract or bond for a deed.   Precisely what interest this gave Mr. Fellowes in the land, or whether it gave him any, we do not think it necessary to determine.   It can hardly be said that he had a perfect, equitable title, before he paid or offered to pay the Messrs. Bissell the purchase price of the property, after they became possessed of the legal title.

That an equitable title, under certain circumstances, will

uphold a mechanics' lien, was recognized by us in the recent case of *Botsford* v. *N. Haven, Middletown & Willimantic R. R. Co.*, 41 Conn., 454. In that case, Blakeslee, the owner of the land, offered to give it to the company if they would locate a depot upon it. The company agreed to the terms, erected the depot, and employed the plaintiff, Botsford, to build the chimneys and do the plastering for the building. He did the work, and filed his lien. We sustained it as against the company, and against mortgagees of the company. The work thus done was necessary to perfect the equitable title of the company to the land, being in effect a part of the purchase price. Till it was done the company had no claim to have the legal title conveyed to them ; and so, when it came, that title only could come charged with the lien. The owner of the land consented to a decree against him.

Now the acquisition of the title, equitable and legal, to these premises, by Mr. Fellowes, and his mortgage of the same in fee to the plaintiffs, was all one single transaction. Even if Mr. Phelps, prior to this time, June 12th, 1869, had furnished materials, or had done work which would entitle him to a lien, there was no point of time in which that claim for a lien could slip in and take precedence of the mortgage. No work however had been done on the buildings prior to this time, but only upon the fence around the lot. There are serious doubts, to say the least, whether that furnished grounds for a lien.

If Mr. Phelps supposed that Mr. Fellowes would acquire a good and unincumbered title, the land records were open to him, and he could readily have seen, any time after the 12th of June, 1869, that simultaneously with acquiring title Mr. Fellows had conveyed it, free from incumbrances, to these plaintiffs. If he had counted on his lien on the property as his security for materials furnished and labor done, prudence certainly would seem to have dictated that, on learning these facts, he should have terminated his work. The amount of his charges was then comparatively small. Instead of ending his work however he continued it. He did much more. " The amount actually expended in work and materials was

largely in excess of what either party anticipated at the commencement." We might perhaps be warranted in saying that if a new contract was not entered into, the old one was so changed and enlarged as hardly to be recognized. By the first arrangement, the barn on the premises was to be repaired. That plan was given up, and a new barn was built. It is by no means certain that had the original understanding as to the amount of expenditures been carried out, the property would not have been ample to pay both these incumbrances. Could the mechanics' lien, equitably, be thus increased to the prejudice of the mortgagees ?

We certainly shall regret the fact, should it prove to be so, that the defendant Phelps should fail to obtain payment for his labor and materials. Still, we are of opinion that the plaintiffs, the mortgagees, are entitled to priority of lien. There are numerous cases which bear upon the question, directly or remotely, and the weight of authority, we think, strongly supports the views we have here expressed. We refer only to *Thaxter* v. *Williams*, 14 Pick., 49 ; *Holbrook* v. *Finney*, 4 Mass., 568 ; *Hayes* v. *Fessenden*, 106 Mass., 228. The statutes of different states, upon this subject, differ somewhat in their phraseology and meaning, and so decisions in one state may not be strictly applicable in another.

The Superior Court is advised to render judgment for the plaintiffs, and to pass a decree in conformity with the views here expressed.

In this opinion CARPENTER and PHELPS, Js., concurred ; PARK, C. J., and PARDEE, J., dissented.