[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this action substitute plaintiff Benton Street Realty Group seeks to foreclose a certain mortgage from defendant Thomas Standish (hereinafter Standish) to The Bank of Boston Connecticut (hereinafter BKBCT). Named defendants Anthony R. Lorenzo, Trustee, Elliott Jaffe, Elsie Jaffe, David Jaffe and Richard Jaffe assert a special defense and counter-claim to the effect that a certain mortgage from Standish to Lorenzo, Trustee, is superior in right to that of the plaintiff.
An extended hearing has been held on the question of the priority of the mortgages. The parties have agreed the court should determine that question first and hold a further hearing on the matter of the terms of an appropriate foreclosure judgment.
The facts, as found by the court, are as follows:
In January 1979, Elliott Jaffe, as settlor, created a Clifford Trust, naming his children David, Richard and Elsie Jaffe as beneficiaries and Anthony Lorenzo as Trustee. The single asset in the trust was certain real property in Stamford, Connecticut at 128 Broad Street, also known as and hereinafter referred to as the Lounsbury Building. Despite the trust, however, Elliott Jaffe (hereinafter Jaffe) exercised decision-making power over operation and disposition of the property.
In or about 1985 Jaffe entered into discussions with the city of Stamford regarding improving CT Page 7248 the Lounsbury Building, purchasing adjacent city land to develop an office building, and enlarging a nearby municipal garage. No agreements, however, were ever signed or options granted. Some time prior to May 1987 Standish approached Jaffe about purchasing the Lounsbury Building for a gourmet French restaurant of the style of L'Americain in Hartford. Standish knew of Jaffe's dealings with the city of Stamford and had in fact himself been solicited by the mayor of Stamford to develop the adjacent city land.
Jaffe and Standish agreed to a selling price of $2,053,000 for the Lounsbury Building together with whatever rights, if any, Jaffe had to the adjacent city property. There is a divergence of testimony as to what was said by Standish and Jaffe at the time of the agreement on the price as to acquisition financing of the transaction by Standish. The court believes Jaffe's testimony that Standish never mentioned a bank mortgage to fund the purchase price. But since it was contemplated the building would have to be renovated for the restaurant, discussion was had of a $750,000 purchase money mortgage to be subordinated to a construction money mortgage to be obtained to improve the property. After reaching agreement in principle, Jaffe and Standish left the working out of the contracts to their respective lawyers, Attorney Saul Kwartin for Jaffe and Attorney Richard Jacobson for Standish.
The first draft bond for deed, was prepared by Attorney Kwartin, was rejected by Attorney Jacobson as more applicable to the sale of residences. The second draft bond for deed, prepared by Attorney Jacobson, contained a clause that the sale was conditioned upon Standish obtaining a first construction mortgage from a bank "in an amount not less than _____ MILLION ($ ____) DOLLARS . . .", which clause was rejected by Attorney Kwartin. The third draft bond for deed prepared by Attorney Jacobson provided that a $750,000 purchase money note shall be secured by a second mortgage on the premises, which mortgage "shall be self-subordinating to a first mortgage . . . in an aggregate amount not to exceed _____ MILLION ($ ____) DOLLARS." Attorney Kwartin objected to that language. The final bond for deed, dated May 1, 1987 and signed by Lorenzo and Standish, contained the following provision relating to the $750,000 purchase money note:
 "Said Note shall be secured by a second mortgage on the premises . . . . Said Note shall be self-subordinating to a first mortgage . . . in an aggregate amount not to exceed the hard and soft cost of construction, CT Page 7249 less $750,000. Buyer represents that the proceeds of any superior mortgage will be used solely for the Project. The Buyer agrees to endeavor to obtain sufficient financing for the Premises so that he will not need to opt to have the Seller take back the promissory note referred to in this paragraph."
The bond for deed further provided it was conditioned upon the assignment by Jaffe to Standish of all rights Jaffe may have in the adjacent city of Stamford land, upon the city selling to Standish that land for $597,000 and permitting Standish to construct a building and add a floor to a municipal garage, in accordance with certain architect's plans.
When Attorney Kwartin returned the signed bond for deed to Attorney Jacobson, he referred in his letter to the final changes in the mortgage self-subordination clause, and added,
 "The agreement by Mr. Jaffe to consider granting the second mortgage to Mr. Standish was based on Mr. Standish's representation to Mr. Jaffe that he has a present net worth of $30,000,000.00 and since he will be signing the mortgage, there will be a responsible signatory thereto.
 "Would you please have Mr. Standish co-sign a copy of this letter confirming this representation . . . ."
Standish paid an initial deposit of $250,000. On March 22, 1988 the parties agreed to extend the closing date to September 1, 1988, time to be of the essence as to that date, and Standish paid an additional $250,000 deposit, making the total deposit $500,000.
In August 1988 Standish obtained a commitment from BKBCT for a loan in the amount of $2,400,000; said loan to be secured by a mortgage to be a first lien on the Lounsbury Building, a first lien on the adjacent land to be acquired from the city of Stamford, a second lien on Standish premises on Charter Oak Avenue in Hartford, and an assignment of Standish's leasehold interest in air rights over the Bedford Street garage in Stamford. In connection with that mortgage, Attorney Jacobson sent to Robert Weinstein, BKBCT's attorney, the bond for deed between Standish and Jaffe. CT Page 7250
On August 26, 1988 closings occurred at Stamford Town Hall, two separate rooms, of three transactions: (1) Lorenzo, Trustee to Standish conveyance, (2) city of Stamford to Standish conveyance, and (3) Standish to BKBCT mortgage. Attorneys Jacobson and Weinstein arrived at Stamford Town Hall first. They started the closing of the Standish to BKBCT mortgage, and Standish executed the mortgage deed covering the Lounsbury Building, the Stamford city land, and the Charter Oak Avenue, Hartford property. That closing was interrupted when Lorenzo and Attorney Kwartin arrived. The Lorenzo, Trustee to Standish transaction commenced with Lorenzo delivering an executed deed of the Lounsbury Building to Standish, and receiving back a Standish to Lorenzo, Trustee mortgage for $750,000 and two bank checks of BKBCT made out to Rob Weinstein, Trustee for Thomas K. Standish, totaling $800,553.90. These were endorsed by Rob Weinstein, Trustee to the order of Lorenzo, Trustee, and contained the legend "Loan Proceeds."
At that closing between Lorenzo and Standish nobody mentioned Standish obtaining bank funding for the acquisition. When all papers were signed and exchanged, Attorney Kwartin agreed that Attorney Jacobson would record the Lorenzo, Trustee to Standish deed and the Standish to Lorenzo, Trustee mortgage. Attorney Kwartin then left.
The land transaction between city of Stamford and Standish, and the mortgage transaction between Standish and BKBCT continued to their conclusions. Attorney Jacobson had recorded in the Stamford Clerk's office the deeds from Lorenzo, Trustee and the city of Stamford to Standish and then the Standish to BKBCT mortgage at 3:20 p. m. and the Standish to Lorenzo, Trustee mortgage at 3:24 p. m.
Attorney Weinstein knew of the Standish to Lorenzo, Trustee mortgage, did not examine it, and relied for the priority of the Standish to BKBCT mortgage on the opinion letter of Attorney Jacobson that the BKBCT mortgage was a first lien and on the title insurance policy covering the transaction.
The first that Attorney Kwartin learned of the order of recording the mortgages was when he got a copy of the BKBCT complaint in this action in which the Lorenzo, Trustee mortgage was listed as a second lien. He immediately called Attorney Jacobson who said that the recording order was a mistake. In a second conversation Attorney Jacobson said he would have to check his file and talk to Standish. Subsequently, Attorney Jacobson told Attorney Kwartin no mistake had been made in recording. CT Page 7251
From these facts the court concludes that the Lorenzo, Trustee mortgage has priority over the BKBCT mortgage for the following reasons:
First, the Lorenzo mortgage was executed and delivered before the BKBCT mortgage.
The priority of a mortgage is not determined by the time only of its execution, or of its delivery, or of its recording on the land records. Time of execution alone is not determinative unless there is delivery. Time of execution and delivery alone is not determinative unless there is recording. Time of recording is not alone determinative if a prior executed and delivered mortgage is recorded within a reasonable time after that mortgage's execution and delivery.
As stated in Apstein v. Sprow, 91 Conn. 421, 423
(1947): "But a deed recorded in a reasonable time after delivery prevails over an attachment made after the delivery of the deed but prior to the recording of it; and what is a reasonable time is a question of fact for the trial court, and its finding is conclusive." Quoted with approval in Farmers Mechanics Savings Bank v. Garofalo, 219 Conn. 810. 819-20 (1991).
Here the court finds that while the BKBCT mortgage might have been signed before the Lorenzo, Trustee mortgage, it could not have been delivered before the Lorenzo, Trustee mortgage. This is so because the BKBCT mortgage secured the Lounsbury Building which was deeded by Lorenzo, Trustee to Standish simultaneously with the Lorenzo, Trustee mortgage. The recording of the Lorenzo, Trustee mortgage within an hour of its execution and delivery clearly was within a reasonable time.
Thus, on the basis that the Lorenzo, Trustee mortgage was executed and delivered first and was recorded within a reasonable time after its execution and delivery, it takes precedence over the BKBCT mortgage.
A second reason for the priority of the Lorenzo, Trustee mortgage is that it was a purchase money mortgage, received in part payment of the selling price of the Lounsbury Building.
In Joseph v. Donovan, 116 Conn. 160, 164 (1933) the Supreme Court quotes 1 Jones Mortgage (8th Ed.) 584, p. 796 as follows: "Where a purchaser receiving a deed to land CT Page 7252 simultaneously conveys it to another as security for a loan used in discharging the purchase price and the two conveyances are part of the same transaction, the title passes through the borrower unaffected by the lien of a judgment against the borrower, which would have attached had the title remained in him."
The priority accorded the purchase money mortgage is to protect a seller who takes a mortgage back, as security for the balance of the sales price, simultaneously with the sale of the land. Leonard v. Bailwitz, 148 Conn. 8, 13
(1964).
A purchase money mortgage may be created not only in favor of a vendor, but also in favor of a third person, who advances money at the time the purchaser receives his deed. 1 Jones, Mortgage (8th Ed.) 586; Middletown Savings Bank v. Fellowes, 42 Conn. 36, 49 (1875). However, the BKBCT mortgage cannot be a purchase money mortgage because the funds advanced under it were used not only in part payment of the Lounsbury Building but also of the city of Stamford land, and in connection with Standish's property in Hartford. As stated in Joseph v. Donovan, supra, 165, "The term `purchase money' does not include money borrowed for any other purpose than to complete a purchase." In Joseph a loan used toward the purchase price of land and to pay other debts of the purchaser was held not to be a purchase money mortgage and entitled to the protection of such a mortgage.
The third reason for the priority of the Lorenzo, Trustee mortgage is that it accords with the agreement of Jaffe and Standish as expressed in the bond for deed. The drafts through which the bond for deed went clearly revealed Jaffe rejected a provision that Standish obtain a bank mortgage as a condition of the agreement, and a provision that the $750,000 second mortgage be self-subordinating to a first mortgage in an unstated number of millions of dollars and unrestricted as to its purpose. The final draft of the bond for deed provided the $750,000 second mortgage was "self-subordinating to a first mortgage . . . in an aggregate amount not to exceed the hard and soft cost of construction, less $750,000" and further provided "the proceeds of the superior mortgage will be used solely for the Project."
Jaffe and Standish had negotiated the bond for deed with the underlying understanding that Standish was purchasing the Lounsbury Building to locate a fancy restaurant there, which would entail considerable reconstruction. Thus, the parties designated the purchase money $750,000 mortgage as "second" because it was to be CT Page 7253 self-subordinated to a first mortgage for the "hard and soft cost of construction" anticipated for the restaurant. Moreover, the self-subordination was to be for a construction mortgage "less $750,000" so that at all times Standish had that additional amount invested in the building.
What is clear is that the bond for deed never intended or expressed that a bank mortgage to finance Standish's purchase of the Lounsbury Building would come ahead of the Lorenzo, Trustee mortgage. The bond for deed speaks only of a first mortgage to cover construction costs, not one to pay the purchase price.
What is absolutely clear from the bond for deed and the circumstances of the closing is that Jaffe and Standish never agreed that the BKBCT mortgage would come ahead of the Lorenzo, Trustee mortgage. Standish never mentioned the BKBCT mortgage to Jaffe during the bond for deed negotiations nor Attorney Jacobson to Attorney Kwartin at the closing. It is inconceivable Jaffe or Attorney Kwartin would have agreed to the priority of the BKBCT mortgage because: (1) it was in the face amount of $2,400,000, which exceeded the purchase price for the Lounsbury Building; (2) it had no relation to the cost of reconstruction of that building for a, restaurant; (3) it financed the purchase of city of Stamford land and covered Standish's Hartford property so its proceeds were not used "solely for the Project" (meaning the reconstruction of the Lounsbury Building), as provided for in the bond for deed.
Two subordinate facts upon which plaintiff relies do not change the court's conclusion. While Attorney Kwartin did write to Attorney Jacobson to the effect Jaffe was relying on the representation of Standish's net worth of $30,000,000 as a basis for Jaffe accepting the $750,000 second mortgage, that does not indicate, in light of all the other evidence, that Jaffe was agreeing to subordinate to the BKBCT $2,400,000 mortgage. Also, while the $800,553 BKBCT checks endorsed to Lorenzo, Trustee contained the legend "Loan Proceeds", that similarly did not indicate Jaffe was agreeing to subordinate to the BKBCT mortgage, the existence, the amount, and the terms of which he was never informed.
On the other hand, Attorney Weinstein, representing BKBCT, and the BKBCT officers, had in their possession before the closing the Standish-Jaffe bond for deed which provided for a second $750,000 purchase money mortgage to be self-subordinated only to a construction mortgage not exceeding hard and soft costs of construction, less $750,000. CT Page 7254 The BKBCT representatives had the opportunity and the responsibility to inquire about that mortgage, and the BKBCT must bear the consequences of their failure to do so.
Attorney Jacobson conducted the two closings separately, keeping the parties to each apart. The court will not suspect his purpose. But there is not slightest doubt that he knew when Attorney Kwartin entrusted the papers for him to record that Attorney Kwartin expected that the Lorenzo, Trustee mortgage would be recorded as a first lien on the Lounsbury Building.
Thus, the court concludes on the facts and the law, that the order of priority is the Lorenzo, Trustee mortgage first and BKBCT mortgage second.
The court will hear the parties further on the terms of the judgment of foreclosure.
Robert Satter State Trial Referee