# Parrish and Hazard's Appeal.

1. Where an iron company, for the purpose of increasing the power of
their furnace, which had been completed and in operation for many years,
contracted with one firm for a new engine, with another for boilers, drum-
heads and fixtures, and with a third for a boiler-stack, all of which were parts
of one design for the improvement of the furnace, and the different firms
under these contracts commenced in their several shops the construction
of the machinery and fixtures previous to the 16th of July 1872, and the
foundation of the boiler-stack was commenced on that day, although none
of the machinery or fixtures were finished or put in place until months
thereafter, the mechanics' liens filed by these several firms for the work so
done and the materials furnished were properly preferred to that of a mort-
gage, the lien of which attached on the 17th of July 1872, in the distribution
of the proceeds of a sheriff's sale of the property.
2. A mechanic's lien can be supported for such machinery as was here fur-
nished, and the fact that the work was not done on the ground, but at a dis-
tance in their shops, does not affect the rights of the claimants.
3. Where additions made to an old building are substantial, for permanent
purposes and made at heavy cost, and are so connected with the original
structure as to make their connection as available, essential and direct as if
they had been built beside its walls, they are "additions of material parts"
to the original structure, and where they serve in their actual use all the pur-
poses that actual additions would have served, and their extent and value are
significant enough to give ample notice to purchasers and creditors of the

change in the character of the property, the additions so made, the work and the materials furnished therefor and the machinery placed therein are the subjects of mechanics' liens, under the provisions of the Act of the 16th of June 1836.

4. Apart from the Act of 1836 the claims of the mechanics' lien creditors who had furnished the machinery in question can be sustained, under the provisions of the Act of the 21st of April 1856.

5. It was alleged that the claim of one of the mechanics' lien creditors was not filed in time, that the last work in pursuance of the contract was done on the 10th of October 1872, and as the lien was entered on the 25th of April 1873, that more than six months had elapsed. It appeared, however, that a charge was added in the bill of particulars on the 29th of October 1872, for fourteen days' work in "altering mud-drums," and that said alteration was the result of a mistake of the company which allowed the claimant for the work: *Held*, that the lien was for work within the contract, and was filed in time.

November 16th 1876.     Before AGNEW, C. J., SHARSWOOD, GORDON, PAXSON and WOODWARD, JJ.     WILLIAMS and MERCUR, JJ., absent.

Appeal from the Court of Common Pleas of *Fayette county :* Of October and November Term 1875, No. 293.

This was the appeal of Charles Parrish and Fisher Hazard, trustees, from the decree of the court making distribution of the proceeds of the sheriff's sale of the real estate of the Dunbar Iron Co.

The case as it appeared from the evidence before the auditor was as follows :—

On the first day of June 1872, the Dunbar Iron Co. executed a mortgage to Charles Parrish and Fisher Hazard, as trustees, on all their real estate, to secure the payment of five hundred bonds, yet to be issued—three hundred for $1000 each and two hundred for $500 each, amounting to the sum of $400,000. This mortgage was acknowledged on the 20th of June 1872, and was filed for record on the 17th of July 1872. Upon this mortgage a sci. fa. was issued, tested the 24th of April 1874, and on the 4th of May 1874, judgment was taken *sec. reg.*, and the amount liquidated by the prothonotary at $400,000. Upon this judgment an alias lev. fa. was issued to No. 191, of June Term 1875. To this writ the sheriff made return that he had sold the premises on the 5th day of June 1875, to Charles Parrish and Fisher Hazard, for the aggregate sum of $155,000, who claimed the fund as first lien creditors of the defendant company, &c. To this Brenneman & Ward, Robinson, Rea & Co., and J. M. Riter's administrators, objected and claimed that they, as holders of mechanics' liens, were the first lien creditors of said company.

The premises of the Dunbar Iron Co., sold by the sheriff, had long been known and used as furnace lands. There had been a furnace on them as early as 1794, which was run at intervals till some twenty-five or thirty years ago. In 1862 another furnace was built on the site of the present one. The stack of this was of stone, and the furnace was blown by steam-power. A company

[Parrish and Hazard's Appeal.]

was incorporated in 1862, under the mining laws of this Commonwealth, under the name of The Youghiogheny Iron and Coal Company, which, in 1870, by a decree of court was changed to the Dunbar Iron Company. In July 1868, E. C. Pechin, Esq., became the president of the company, and took charge of its affairs. Under his management, a vast system of enlargement and general improvement was soon entered upon, and so far carried out, as to make Dunbar the most complete furnace, in all its appointments, ever erected in Western Pennsylvania.

In the summer of 1870, the old stone furnace-stack was torn down, and an iron stack, larger and some fifty-eight feet high, was erected on the old foundation. This new furnace blew in on the 6th day of October 1870, and was blown by the old horizontal engine which had been used for the old furnace, and the present old vertical engine. In 1872, the company considering that more power was required than their engines would give, and the president of the company having in view the erection of an additional new furnace, contracted for the boilers, smoke-stack and engine, which are the subjects of the mechanics' liens claimed. The furnace, with the necessary buildings connected, consist of the iron furnace-stack, about ten and a half feet in diameter, fifty-eight feet high, connected by an iron bridge with the hoisting-house. The hoisting-house is connected with the stock-house. The stock-house is a wooden frame, and on the side opposite from the furnace, and is not enclosed for a distance on that side of twenty-six feet; the remainder is covered with sheet iron; the roof is also of sheet iron. Immediately in the rear of the furnace, and in close proximity to it, are the hot blasts.

On the opposite side of the furnace from the hot blasts, and at some distance from it, the two engine-houses, pump-house and boiler-house are erected, and are only connected with the furnace by the blast pipes, passing from the cylinders in the engine-houses through the hot blasts into the furnace by flues, to carry the heated gases from the trunnel head of the furnace to the boilers. These flues pass underground from the furnace to the boilers. The casting house is of brick, and is connected with the furnace, and stands on the opposite side of the furnace from the stock-house. The boiler-house is the largest structure, in extent of surface covered, belonging to the furnace. It is located ninety-three feet distant from the furnace, and is only connected with the furnace by a large underground flue leading from the furnace to the boilers to carry the caloric to heat the boilers. This house is constructed thus: there is a stone foundation, twenty feet square of solid masonry, sunk deep in the ground and raised some ten feet above the surface of the ground. On this foundation was erected an immense iron smoke-stack, ninety feet high and ten and a half feet in diameter. There were built for the boilers to rest upon seven walls, each sixty-seven

feet long, from eighteen inches to two feet thick, and from two to three and a half feet high. The outer walls are joined to and connected with the foundation of the smoke-stack. Six boilers are placed upon these walls, and are encased by a brick wall on each side and passing behind at the end of the boilers, connecting with the smoke-stack. This casing of brick extends to near the top or upper side of the boilers. Some three or four months after the boilers had been set up and in use, a frame building for the sole purpose of covering and protecting the boilers, walls and machinery was set up around and over the boilers. This building or covering is formed by posts set upon stones outside the boiler walls, by girders, plates, rafters, &c., and is weather-boarded from the eaves down as low as the brick wall, except in front of the boilers. In front of the boilers is a shed some eight feet in width, joined to the main frame. The whole is covered by a comb roof made of boards. The new engine-house is located immediately in rear of the old engine-house now in use, and is about the same distance from the furnace-stack as the boiler-house is from the same. It is a frame building twenty by sixteen feet, and is some thirty feet high. In it are the new vertical engine and blast cylinder.

It was in evidence that at least a week prior to the 16th of July 1872, work had been commenced on the ground for the foundation of the smoke-stack, and that on that day the masonry for it was commenced. The time the work on the ground for the engine house was begun did not definitely appear. On the 5th of April 1872, the firm of Brenneman & Ward, doing business in the city of Pittsburgh, received an order from Mr. Pechin, president of the company, for six boilers, drum-heads and other machinery and materials therewith connected, and on the day following the firm ordered iron for the work, and commenced work on the 29th of April 1872, at their works in Pittsburgh, on the boilers, &c., and continued the work until the 30th of September following, when it was ready for delivery.

The Dunbar Iron Co. received the work at the depot in Pittsburgh, and had it conveyed to their premises at Dunbar, when Brenneman & Ward set it up and put the boilers in place, completing the same on the 28th of October 1872.

For these boilers, their work and materials furnished, Brenneman & Ward filed a mechanics' lien, in the Common Pleas of Fayette county, on the 25th of April 1873, for a balance due them of $2798.45 against all that certain one-story boiler-house or building and machinery and fixtures therein, as well as against the curtilege or land appurtenant, &c.

William F. Conley and Samuel H. Stewart, administrators of James M. Riter, deceased, filed a mechanics' lien, on the 19th day of May 1873, on the same smoke-stack, boiler-house, machinery, and curtilege, &c., for the sum of $4146.80 due their intestate, for

work and labor done and materials in and about said building, &c. The work and materials furnished for which this lien is claimed was done and furnished between the 1st day of October 1872, and the 30th day of November 1872. By a letter of Mr. Pechin's received in evidence, it appears that the contract for the stack was concluded on the 10th of April 1872. The evidence of Mr. Conley proves that work was commenced on the stack in June 1872; that the stack was delivered on the ground in September following, and was put in place and completed November 30th 1872. Mr. Riter died January 17th 1873.

On the 6th day of June 1873, Robinson, Rea & Co. filed a mechanics' lien, for the sum of $17,562.24 against the same boiler-house, smoke-stack and machinery, and also against the engine-house and machinery. This claim is for fire fronts and other work used in and about the boiler-house and for the vertical engine in the engine-house. The work was done between the 24th day of August 1872 and the 21st of May 1873.

The evidence proved that the work on some of the items in the claimant's bill was commenced at their shops in Pittsburgh, on the 23d of April 1872, and was continued until about the 30th of October 1872, when the articles were delivered at the depot in Pittsburgh for shipment to the furnace of the company, and were then set up by the claimants on the company's grounds.

The questions that arose before the auditor were these: Was the property described in these mechanics' liens such buildings as a mechanics' lien may be filed against under our Acts of Assembly? When did these liens attach? Did they relate back to the commencement of the work in the shop, on the machinery furnished, or to the time when the work was placed upon the ground, or did they attach from the date of the first work done on the ground?

The auditor found that the boiler-house with the boilers and machinery in such a building would sustain the lien, and that the commencement of the masonry for the boiler-stack and the boiler-beds was the commencement of this building, and as the work done and the materials furnished were parts of one general plan and one intended improvement, the commencement of the building, which was on the 16th of July, ante-dated the recording of the mortgage, which was on the 17th of July, and the mechanics' liens were therefore to be preferred to the lien of the mortgage, and made a distribution of the fund accordingly.

To this report the trustees excepted, alleging that the work done and materials furnished were simply repairs to an old furnace and were not the subject of a mechanics' lien, but the court overruled the exceptions and confirmed the report.

From this decree this appeal was taken.

*Daniel Kaine* (with whom were *Samuel Dickson* and *John C.*

*Bullitt*), for appellants.—The Act of 16th June 1836, provides that "every building erected * * * shall be subject to a lien," &c. All the provisions of the act and its supplements show that by "building" was meant a substantial, independent structure. The lien covered the ground only as accessory to the building, and after its destruction by fire the lien on the land ceased : The Presbyterian Church *v.* Stettler, 2 Casey 246 ; Wigton & Brooks's Appeal, 4 Id. 161. It may be difficult to decide whether the new structure is a "building" within the meaning of the act, or only an alteration of an old building, and where the facts are disputed it may be a question for the jury ; but the principles by which the question is to be decided are well settled, though the application may be difficult. In Norris's Appeal, 6 Casey. 122, SHARSWOOD, J., reviews the previous authorities, criticising Armstrong *v.* Ware, 8 Harris 519, and approves of Judge KENNEDY's phrase, "the design of its character," as a test of the character of the alterations.

In Miller *v.* Hershey, 9 P. F. Smith 64, AGNEW, C. J., says : "The idea which runs throughout all the cases is newness of structure in the main mass of the building," and this is reaffirmed in Diller *v.* Burger, 18 Id. 432.

Now the work for which these liens were filed was in no sense independent or original. Everything was simply tributary to the furnace as it stood before the work was begun. What was done had no reference to the building by virtue of which these liens have been upheld, but would have been done just as it was, if no such building had been erected. It was not then planned or designed, and was not begun till months afterwards. The character of their work, "*the design of its character*," would not have been different in any sense if the new boilers had been put in under an old roof or left without any cover at all. No independent structure or erection was contemplated, because, except as tributary to the furnace, the repairs and additions were of no value. It is the furnace, as originally constructed, which is "the building," within the meaning of the law, and the adjacent structures are but incidental to its working. This was the view taken by this court in the precisely parallel case of Summerville *v.* Wann, 1 Wright 182. See also Thoma & Blandy's Estate, 26 P. F. Smith 30 ; and Miller *v.* Hershey, *supra*.

That this was understood by the legislature to be the state of the law is shown by the amendment of 1st May 1861, and of 1st August 1868, Purd. 1028, pl. 20, 21, providing for the filing of liens for alterations, *additions* and repairs, and also by the acts giving liens for fixtures, engines, and other improvements about iron works and mines. These acts would have been, except as to leasehold interests, entirely superfluous if the liens in this case are good.

It is submitted, therefore, that upon a proper construction of the law, and under the authorities, the improvements made in this

case were not the subject of a mechanics' lien, and even if this boiler-shed could be treated as "a building," it was not begun in time to save them. Nelson v. Campbell, 4 Casey 156, relied upon by the auditor, has been pointedly disapproved in Diller v. Burger, 18 P. F. Smith 432.

But if these are valid mechanics' liens, where do the liens date from ? If the boiler-house, with the boilers and machinery, " is such . a building of itself," as found by the auditor, or is the subject of a mechanics' lien, then it is a separate building and is bound by the lien of Brenneman & Ward, who furnished the boilers and fixtures connected therewith. This lien is filed April 25th 1873, "against all that certain one-story *boiler-house* or *building*, and machinery and fixtures therein," &c. The items of the bill of particulars commenced on the 30th day of September 1872, and follow each other consecutively up to and including the 11th day of October 1872. There the bill of particulars properly ends, for the item under date of October 29th, altering mud-drums, fourteen days at $3.50,—$49.00—was for work done after the work was completed and the articles in place, and was for an alteration made afterwards, and formed no part of the work done or materials furnished.

The claim of James M. Riter is filed against the same building and machinery as that of Brenneman & Ward, with the addition of including the smoke-stack put up by him. For this it is claimed that the foundation was commenced the day before the mortgage was recorded. Robinson, Rea & Co. claim a balance due them of $17,562.24 for furnishing and putting up the steam-engine and blowing cylinder, and have not only filed this claim against the said engine and blowing cylinder, and engine-house, but against the boilers, &c., covered by the claim of Brenneman & Ward and J. M. Riter, as follows: "Against all that certain one-story boiler-house or building and the machinery and fixtures thereof, from said boiler house by an alley or passage way." Now, if this engine-house, with the engine and machinery therein, "is such a building of itself," as found by the auditor as is the subject of a mechanics' lien, then it is a separate building and the claim of Robinson, Rea & Co. must be confined to it. They cannot extend their lien over other buildings with which they had nothing to do, separated from theirs forty-two feet.

*Alfred Howell* and *C. E. Boyle*, for appellees.—If previous to the Act of 1836, a copper kettle or boiler fixed (after its erection) in an additional building used as a brew-house, was part of the freehold and subject to the Mechanics' Lien Law (Gray v. Holdship, 17 S. & R. 413); if the castings used in erecting the steam-engine by which a saw-mill was propelled, were part of the building, and though ordered by the contractor, payment could be enforced against the building, against the engine, and through them against the

[Parrish and Hazard's Appeal.]

owners of the land (Morgan *v.* Arthurs, 3 Watts 140); and if burr mill-stones, like any parts of machinery, were part of the building, and subjects of a mechanics' lien upon the mill (Wademan *v.* Thorp, 5 Watts 115); and if by subsequent Acts of Assembly, wharves, curbstones for pavements, gas-fixtures, grates and furnaces were made subjects for its operation, surely it cannot now be denied that boilers, a stack and blowing engine and cylinder, capable of making a furnace turn out forty tons of pig-iron a day, are subject to that law, and entitled to its protection.

But it is insisted by appellants that there must be a "building" in every case for the lien to attach to, and a new one at that. It cannot be pretended that the word "building" in the act is to be strictly defined or limited as to size, finish, use, material or cost. A kitchen, a ten-pin alley, a bar-room, a stable, a barn, a saw-mill, rolling-mill, machine-shop, factory, a plank-house, ice-house, a log cabin without cellars, as well as a brown stone mansion, and a church can be, and most of them have been made subject to such a lien. Why, then, cannot a boiler-house and engine-house, made as these were, so permanent and durable as to have remained in use ever since, and so permanent and complete for the uses and purposes of their erection, that none others have been required, be also subject to such lien?

The case of this furnace is not the case of a factory, mill or shop where there is but one covering over the machinery by which it is to be operated, and Summerville *v.* Wann, 1 Wright 182; Miller *v.* Hershey, 9 P. F. Smith 64, and Thoma and Blandy's Estate, 26 Id. 20, are therefore to be distinguished from this case.

Our new work and materials were not put *in* or *upon* any buildings then on the ground, but went into the erection and construction of new buildings—new additions to other works—were parts of a new system of works, all external, for the purpose of blowing the present furnace and another to be erected. That they are subject to the lien is abundantly sustained by the following authorities: Driesbach *v.* Keller, 2 Barr 77; Armstrong *v.* Ware, 8 Harris 519; Gaule *v.* Bilyeau, 1 Casey 521; Nelson *v.* Campbell, 4 Casey 156; Light-foot *v.* Krug, 11 Id. 348; Pretz & Gausler's Appeal, 11 Id. 349; Harman *v.* Cummings, 7 Wright 322; Hershey *v.* Shenk, 8 P. F. Smith 382.

We contend also that the Act of the 21st of April 1856, Pamph. L. 496, applies to this case, and extends the Act of 1836 to certain accessions to buildings, including machinery in and about mills, of any kind, &c. It is contended, therefore, that, in any view of the case, we were entitled to a lien on the real estate to which accessions had been made by our work and materials, which became part and parcel of it, under whatever name or description, and whether there was a building or not. The liens were filed in time, the machinery was in process of construction in the shops of the different contrac-

tors, in the spring of 1872; and the fact that they were commenced there and not on the ground cannot affect the liens: Singerly v. Doerr, 12 P. F. Smith 9; Hinchman v. Graham, 2 S. & R. 170.

But if what constitutes the commencement of the building, as fixing the dates and priority of our liens, is similar in *all* cases of erections, viz., "the first labor done on the ground," we have satisfied its requirements. The excavations for the foundations of the boiler-stack and boilers were commenced at least one week before the mortgage to the appellants was recorded, and the building of the foundations was commenced on the 16th of July 1872, one day before said mortgage was recorded.

It is objected that the claim of Brenneman & Ward was not filed in time, because the last item proper in their bill of particulars is on the 11th of October 1872. This is clearly a mistake. For fourteen days after that date, and up to October 29th 1872, they were at work on the ground altering the new mud-drums, which were too long at one end. They took the heads out and cut them off, and then fixed the heads in. This was owing to a mistake by the company in the drawing they gave to make them by, and they were not fit for use nor finished till this work was done and materials were furnished.

Mr. Justice WOODWARD delivered the opinion of the court, May 7th 1877.

When the contracts were made under which the claims of the mechanics' lien creditors are asserted in this proceeding, the furnace of the Dunbar Iron Company had been completed and in operation for many years. No work in the way of erection or construction had been done subsequently to 1870, when a furnace stack of stone had been torn down, and one of iron put up in its place. In the spring of 1872, the company requiring more power than the engines they had in use afforded, determined to introduce new machinery. Contracts were accordingly made with Robinson, Rea & Co. for a vertical engine; with Brenneman & Ward for six boilers and their connected materials and fixtures; and with James M. Riter for a boiler-stack. For the balances remaining unpaid for the work done under their contracts the liens of these creditors were filed.

On the 5th of June 1875, the real estate of the Dunbar Iron Company was sold by the sheriff of Fayette county, by virtue of a levari facias in a judgment on a mortgage executed to Charles Parrish and Fisher Hazard as trustees, to secure bonds to be issued by the company to the amount of $400,000. The mortgage was dated the 1st day of June 1872, was acknowledged on the 20th of that month, and was recorded and became a lien on the 17th of July 1872. The trustees purchased the property at the sheriff's sale for $155,000. As bonds amounting to about $300,000 had been negotiated and were outstanding, the whole fund was claimed on

distribution to be applicable to the mortgage-debt. The auditor to whom the claims of the parties were referred, appropriated the money to the extent of the balances due on the mechanics' lien to their payment, and his report was confirmed by the Common Pleas. At the argument here, the right of the appellants to the amount thus appropriated was asserted on various grounds, and their views were pressed by their counsel with great vigor and great ability. The principal point urged was that the work done and materials furnished by the appellees were not, by any fair construction of the statutes, subjects of mechanics' liens.

It is very clear that the value of the furnace property was largely enhanced by the machinery and fixtures which the Dunbar Company obtained under their contracts with the lien creditors. The account of Robinson, Rea & Co. amounted to $24,745.95 ; that of Brenneman & Ward to $9148.45 ; and that of Riter to $4736.80. It is very clear also that the structures supporting, enclosing and covering the machinery were put up substantially, for permanent purposes, and at heavy cost. The enclosing buildings were not erected for some months after the work of the appellees was completed, but they were necessary to the perfection of the general plan of the improvements and for the protection of the engine and boilers and their fixtures. The extent and importance of the structures may be shown by a condensation of the description of them in the auditor's report. The foundation of the new engine was solid masonry, ten feet square and six feet in depth. The house enclosing it, which was erected at the distance of about ninety-three feet from the furnace, was framed, weather-boarded, with windows in it, covered by a comb roof and thirty-five feet high. The boiler-house was built at about the same distance from the furnace as the engine-house. The two buildings were about forty-two feet apart. The foundations of the boilers were seven walls, each sixty-seven feet long, from eighteen inches to two feet thick, and from two to three and a half feet high. Brick walls were built on the stone foundations to the height of six feet, extending nearly to the tops of the boilers and enclosing them. Some three or four months after the boilers were set up, a frame building to cover and protect them was erected. It was supported by posts set on stones outside the boiler walls, was strengthened by girders, plates and rafters, was weather-boarded from the eaves down to the brick wall, except in front of the boilers, and had a comb roof of boards. The iron boiler-stack, ninety feet high and ten and a half feet in diameter, was built on a stone foundation twenty feet square, deeply sunk in the ground, and raised ten feet above the surface. Extended and expensive as these improvements were, it becomes an interesting as well as an important inquiry whether these creditors, whose contributions to the value of the Dunbar Company's property have been so material, are within or without the protection of laws which secure compen-

sation to mechanics for their labor and property employed in the erection of buildings under all ordinary contracts.

Under the facts found by the auditor there is no room for doubt that all the improvements made were contemplated from the outset, and were all parts of one settled original design. Robinson, Rea & Co. began work on the engine at their shops in Pittsburgh on the 23d of April 1872, under a contract entered into previously. The order for the boilers, drum-heads and fixtures was received by Brenneman & Ward on the 5th of April, and they commenced their work on the 29th. Riter's contract was entered into on the 10th of April, and the stack was begun sometime in the following June. At the date of the record of the mortgage, therefore, all these parties were employed in the execution of their contracts.

As has been stated, the mortgage became a lien on the 17th of July 1872. When the first work was done on the ground did not precisely appear before the auditor, but the masonry for the foundation of the boiler-stack was begun on the 16th of July. There was evidence that at least a week earlier excavations for the foundation had been commenced. The location for the boiler-stack and boilers had been fixed as early as the 6th of July, for the written contract with E. G. Lincoln for the masonry was made that day. It was decided in Pennock v. Hoover, 5 Rawle 291, under the Act of the 17th of March 1806, that the commencement of a building was the first work done on the ground for the foundation, as part of the work suitable and necessary for its construction. By this rule, the erection of these structures was begun at least as early as the 16th of July 1872, one day before the mortgage was recorded. It is true that excavations for the engine were delayed until September, but that work was merely a continuation of the work begun in July, and was part of the entire scheme of improvements that had been planned and matured in April. The notice given by breaking the ground for the boiler-stack was notice of all that was intended to be done in carrying into effect the details of a single enterprise definitely projected and arranged. All the structures were upon the furnace property; all were to serve the purposes of the furnace; all the contracts had been made; and the machinery had been in the course of construction nearly three months when the first masonry was laid. Inquiry by the trustees or by bondholders would have led to the disclosure of the whole scope of the improvements the company had in contemplation. And the duty of such inquiry was created by the work visibly done for the commencement of the buildings. If the claimants had a right to liens at all for machinery furnished for such detached and subsidiary use as theirs was applied to, they were entitled to them from the 16th of July 1872; they had precedence of the trust-mortgage not then recorded; and the claim for the engine was recoverable equally with the claims for the boilers and the boiler-stack.

That such machinery as was furnished here was of a kind for which, in the ordinary case of an erection, a lien could be supported, is well established.   A lien was sustained for a copper boiler in a brew-house in Gray *v.* Holdship, 17 S. & R. 413 ; an engine by which a saw-mill was propelled in Morgan *v.* Arthurs, 3 Watts 140 ; and for burr mill-stones in Wademan *v.* Thorp, 5 Watts 115. The fact that the work was done mainly in Pittsburgh shops, does not affect the rights of the claimants.   It was said by AGNEW, J., in Singerly *v.* Doerr, 12 P. F. Smith 9, that " steam and ma-chinery have revolutionized the manner of building houses.   Much of the work formerly done by hand at or near the building is now done at the mill."   It was held that if work is done for and on the credit of the building, it makes no difference where it is done.

. But it was strongly urged on the argument that these liens were filed against machinery and fixtures only ; that the buildings were mere appurtenances to the furnace, in which admittedly no change was made ; and that under both the letter and the spirit of the Acts of Assembly the liens cannot be maintained.   In expressing the opinion that these were such structures as would support the claims, . the auditor said that, detached and separated from the furnace, they would be comparatively valueless ; but he added that " the liens must attach incidentally in such cases to so much of the land and other structures as is necessary for the use and enjoyment of the same for the purposes for which these buildings were intended." This statement of the law is in accordance with rules settled by this court where structures have been added to or rebuilt.   Do those rules apply to detached buildings such as these ?   In Nelson *v.* Campbell, 4 Casey 156, the facts as stated in the opinion of the judge who decided it were, that " Nelson had a tavern-house on one corner of his lot, and a stable on the corner diagonally oppo-site ; and he enlarged the house by adding new buildings on the other two corners, which enclose two sides of the original house, and are united together.·   Now if this lien is to be enforced against the ground occupied by the new buildings and the yard belonging to them, the defendant's lot is cut into three pieces, and his house and stable are totally separate, and both left without a yard.   Be-sides this, the new buildings include his dining-room and kitchen, and both pairs of stairs of his house."   The points ruled were, that it is not necessary that a new building erected should be distinct from and independent of older buildings in order to sustain a lien for work done and materials furnished towards its erection and con-struction ; that the lien in such cases attaches to the whole build-ing and so much of the ground of the owner adjoining as is neces-sary for the use and enjoyment of the building for the purposes for which it was designed ; and that the amount of land claimed need not be designated, as the parties are not bound, nor the extent of the land that will pass by a sale affected, by that set forth in the

lien filed, and the parties may have that designated by commissioners appointed by the court before sale. Nelson v. Campbell has been repeatedly quoted as authority in later cases, and the remark of AGNEW, J., in Diller v. Burger, 18 P. F. Smith 432, that it was a "very peculiar case," and that "it can scarcely become a precedent," did not express, and was not intended to imply disapprobation of the conclusions it reached. In Lightfoot v. Krug, 11 Casey 348, a kitchen one story high attached to a main building of two stories, was declared to be an erection to authorize a mechanics' lien. In Pretz & Gausler's Appeal, 11 Casey 349, a three-story brick hotel had been erected in 1853. A three-story brick kitchen, adjoining to and communicating in each story with the main building, was erected in 1857. A mechanics' lien against the kitchen was sustained. The same rule was applied in Harman v. Cummings, 7 Wright 322, where a wing of seventeen feet front had been added to a dwelling of twenty-five feet front. The exceptional case of Landis's Appeal, 10 Barr 379, would probably have been differently decided as to the new back building that had been erected there, if Judge COULTER's opinion could have been written in the light of the later cases. That a substantial addition of material parts, or re-building on another and larger scale, although parts of the old are preserved and incorporated in the new, is a rule recognised by SHARSWOOD, J., in Hershey v. Shenk, 8 P. F. Smith 382, as having been settled by Driesbach v. Keller, 2 Barr 77; Nelson v. Campbell, *supra*, and the authorities that have followed them.

It was argued on the part of the appellants, however, that the cases quoted applied only to instances in which the principal building had been added to or rebuilt. As mere appurtenances to the furnace, these structures were said to bear the same relation to it that ordinary out-houses bear to an ordinary dwelling, and under that relation to be not subject to mechanics' liens. If the premises were true, the conclusion was perhaps well drawn. In the decisions on this point there has been some uncertainty and confusion. In Werth v. Werth, 2 Rawle 152, a claim was filed against a barn for work done on it alone, and this court held that the lien was to be confined to the building and the land covered by it, with the necessary means of enjoying it in the usual way. In Burt v. Kurtz, 5 Rawle 246, a claim was filed against a dwelling-house, rope-house, rope-walk and stable, and was allowed. In Hoatz v. Patterson, 5 W. & S. 537, a lien was claimed for erecting a furnace, casting-house, stables and houses necessarily appurtenant thereto, and no objection on that ground was made. In Lauman's Appeal, 8 Barr 473, the claim was against a two-storied dwelling, Swiss barn, wagon-shed, wood-house, wash-house, smoke-house and ice-house on a farm. The right to the lien was not contested. The only question was whether it was a case for apportionment. It was

[Parrish and Hazard's Appeal.]

held that it was not, as the buildings were to be " considered as a whole, incapable of separation without injury." On the other hand, in Barclay's Appeal, 1 Harris 496, where a claim was filed for work in the erection of a building " and appurtenances," the court held the claim bad, and said : " An appurtenance may be a yard, an alley, a cistern, a conduit-pipe, an ice-house, a smoke-house, a privy, a stable or other out-house, distinct from the principal building mentioned in the written claim, and consequently not within the purview of the lien laws." But whatever may be the rule of law as to ordinary out-houses, it is believed to be inapplicable to the buildings against which these liens were filed. The engine-house and boiler-house became parts of the furnace the moment they were completed. They were connected with it by blast pipes and flues, and the connection was as available, essential and direct as if they had been built beside the furnace walls. In the language of the decisions, they were " additions of material parts" to the original structure. They served in their actual use all the purposes that actual additions would have served, and their extent and value were significant enough to give ample notice to purchasers and creditors of the change in the character of the property. The decision of the auditor and the decree of the court below in support of these liens under the provisions of the Act of the 16th of June 1836, were not only in accordance with the general principles deducible from the cases that have been collected, but vindicated by the very rules which those cases have established.

Apart even from the statute under which those rules have been settled, they are still capable of such an application as to sustain these claims. The Act of the 21st of April 1856 extended the provisions of the Act of 1836 and its supplements as fully as the same were applicable to buildings, to every steam-engine, coal-breaker or parts thereof, pump-gearing, hoisting-gearing, and fixtures and machinery in or about mills of any kind, iron or coal works, coal mines and iron mines. In Summerville v. Wann, 1 Wright 182, it was held that the new act did not introduce any new principle into the lien law; that it specified the objects for which, and not on which, a lien might be had; and that it did not authorize liens for work and materials done and furnished in the alteration and repair of an old building, but only extended the provisions of the Act of 1836 to certain things or accessions for which claims might be filed. The particular point ruled was, that a lien could not be supported against a mill, which was itself left unaltered, for new machinery put in to replace old machinery taken out. Of the propriety of the ruling there can be no doubt. The obvious reasons for it were clearly stated by the present Chief Justice, in Miller v. Hershey, 9 P. F. Smith 64. After referring to Driesbach v. Keller, 2 Barr 79; Landis's Appeal, 10 Barr 379; Armstrong v. Ware, 8 Harris 520, and Norris's Appeal, 6 Casey

127, he said : " The idea which runs through all the cases is new-
ness of structure in the main mass of the building—that entire
change of external appearance which denotes a different building
from that which gave place to it, though into the composition of the
new building some of the old parts may have entered. This new-
ness of construction must be in the exterior, in the main plan of
the building, and not in its interior arrangements. This was
decided in Summerville v. Wann. There appears to be a good
reason for this not only in the fact that the external walls consti-
tute the strongest mark of its identity, but also in the notice that
the external change furnishes to purchasers and lien-creditors."
No such reason as this can possibly require the application of the
rule of Summerville v. Wann to the new structures of the Dunbar
Iron Company. There was " newness of construction" throughout.
They were large, massive, and of course visible. No purchaser
and no creditor could possibly be deceived. It was said by Mr.
Justice STRONG, that the Act of 1856, as a supplement to the Act
of 1836, should be construed in reference to it. There is equal
necessity that the general tendency of the cases that have illus-
trated the elder act should be kept in sight in the construction of
the supplement. Even regarding the buildings as ordinary out-
houses, the same process of reasoning that supported the lien
against the additions to Nelson's tavern in Nelson v. Campbell, the
liens against the kitchens in Lightfoot v. Krug, and in Pretz &
Gausler's Appeal, and the lien against the new wing in Harman
v. Cummings, requires that the liens against the engine-house and
boiler-house of the Dunbar Company should be supported. The
new structures were accessions to the existing property largely
increasing its productiveness as well as its intrinsic value. The
rights of the claimants were clearly defined, and were capable of
enforcement in forms and on principles established by this court.
The claims were filed for the machinery against the machinery and
the buildings by which it was enclosed. They should be allowed
by a construction of the law that is within its very letter, that is
believed to be within the very view of the legislature in enacting
it, and is in direct accordance with rules by which the provisions
of the Act of 1836 have been construed and applied.

　To the authorities principally relied on by the appellants brief
reference only is required. In Norris's Appeal, 6 Casey 122, the
plan of a building was changed and enlarged during its erection.
It was held that liens for work done after the change was made
related to the date of the alteration on the ground. Miller v. Her-
shey, *supra*, decided that repairs and alterations which did not fairly
change its exterior into a new structure, did not confer a lien. In
Diller v. Burger, 18 P. F. Smith 432, after a brewery had been
erected, an addition to it was built. Liens for machinery for the
brewery were filed more than six months after its completion, but

less than six months from the completion of the addition. The court below submitted to the jury the question whether both buildings were originally intended to be one, directing a verdict for the plaintiff if they found it had been so intended, and for the defendant if they found otherwise. The judgment was affirmed. In Thoma & Blandy's Estate, 26 P. F. Smith 30, after a furnace had been completed and put in blast, it was blown out on account of defects in its plan and construction. Money was raised on mortgage, and the existing mechanics' liens, except one, were paid. Other work was done in changing the construction and building new kilns. The building was held to have been finished at the date of the mortgage, and liens for work after that date were postponed. It is not apparent how anything contained in these authorities ought to control the decision of this controversy.

The claim of Brenneman & Ward was especially objected to at the argument on the ground that it was not filed in time. The last work in pursuance of the contract was alleged to have been done on the 11th of October 1872, and as the lien was entered on the 25th of April 1873, it was insisted that an interval of more than six months had gone by. A charge was added, however, in the bill of particulars on the 29th of October 1872, of $49 for fourteen days' work in " altering a mud-drum." The auditor made no report on this subject, but Levi Brenneman, in his testimony, said : " The item charged October 29th occurred in this way—we had a drawing to make the drums by, and the draughtsman had made a mistake in the draft; they were too long at one end; we took the heads out and cut them off, and then fixed the heads in again. This being the company's mistake, they allowed us for the work." It would seem that the item was for work within the contract, and the objection that the lien was not filed in time was without foundation.

Decree affirmed at costs of appellants, and appeal dismissed.