PUSEY & JONES v. PENNSYLVANIA PAPER MILLS. (2.)

(Circuit Court, M. D. Pennsylvania. October 25, 1909.)

No. 44, October Term, 1908.

1. RECEIVERS (§ 128*)—RECEIVERS' CERTIFICATES—EXPENSES OF RECEIVERSHIP —PRIORITY.

An order of a court of equity which has assumed the management of property through its receiver, authorizing the issuance of receivers' certificates, to be a first lien on the property, must be construed to give them priority over other liens only, and cannot be held to prevent the court from first paying the expenses of the receivership from the proceeds of the property when sold.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 219; Dec. Dig. § 128.*

Nature of certificates, see note to Postal Telegraph Cable Co. v. Vane, 26 C. C. A., 350.]

2. RECEIVERS (§ 128*)—INSOLVENCY PROCEEDINGS—DISTRIBUTION OF FUND— PRIORITIES—STATE TAXES.

Taxes due the state of Pennsylvania on the property of a corporation which by Act Pa. June 1, 1889 (P. L. 437) § 31, are made a lien from the time they are due and payable out of the proceeds of any judicial sale in preference to any judgment or lien, are payable from the proceeds of the company's property when sold in foreclosure proceedings in advance of either liens or receivers' certificates.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 219; Dec. Dig. § 128.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MECHANICS' LIENS (§ 291*)—ENFORCEMENT—EFFECT OF JUDGMENT.

Under the law of Pennsylvania a judgment on a mechanic's lien is conclusive of the indebtedness and the amount due, but leaves open the question of the validity and standing of the lien which may be contested by other lienholders.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 608; Dec. Dig. § 291.*]

4. MECHANICS' LIENS (§ 246*)—ENFORCEMENT—RIGHT OF OTHER LIEN CREDITORS TO CONTEST—EXCLUSIVENESS OF STATUTORY REMEDY.

The remedy given by Act Pa. June 4, 1901 (P. L. 442) § 23, which authorizes any person interested to intervene in an action on a mechanic's lien and contest the validity of such lien, is not exclusive, and does not debar other lien creditors from contesting the validity of such lien in another court which has the distribution of the fund produced by a sale of the property.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 431; Dec. Dig. § 246.*]

5. MECHANICS' LIENS (§ 25*)—CONSTRUCTION AS DISTINGUISHED FROM REPAIR OF BUILDING.

Where the pulp mill of a paper company was destroyed by fire, contracts for rebuilding the same and installing machinery therein to adapt it to the use of a new and different process, the building being separate from the other buildings of the company and while operated in connection therewith being capable of independent operation, relate to the building of a new structure and not to the repair of an old one, within the meaning of the Pennsylvania mechanic's lien law of June 4, 1901 (P. L. 431).

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 26; Dec. Dig. § 25.*]

6. MECHANICS' LIENS (§ 132*)—TIME FOR FILING STATEMENT OF LIEN—EXTENSION BY ADDITIONS TO REMEDY DEFECTS.

Where, on the original completion and equipment of a pulp mill by the contractor, it failed to develop the capacity contemplated, the subsequent doing of work and putting in of new and additional appliances in an attempt to bring it up to such capacity, the fault not being that of the contractor, operated to extend the time for the filing of a mechanic's lien for the entire work, even though some of the new appliances were placed in a separate building, being designed to supplement those within the building.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 200; Dec. Dig. § 132.*]

7. MECHANICS' LIENS (§§ 136, 186*)—STATEMENT OF LIEN—DESIGNATION OF BUILDING—MANUFACTURING PLANT—SEPARATE BUILDINGS OF—CURTILAGE.

Under the Pennsylvania mechanic's lien law (Act June 4, 1901 [P. L. 432] § 2), which provides that "every structure or other improvement, and the curtilage appurtenant thereto, shall be subject to a lien," etc., the lien given is on the particular structure into which the labor or materials go, and its curtilage, and the fact that a new building upon its erection becomes a part of a manufacturing establishment does not extend the lien for materials to all the buildings which make up the plant, old as well as new. A statement of lien for the construction of such building is therefore invalid, unless limited to the new building alone, so that others may be advised of its extent by the record.

Nor is this affected by the fact that the curtilage may properly include the whole plant, and if too much is claimed may be cut down by the court to what it should be; the question being one of specification and extent of lien and not of curtilage, which has first to be disposed of.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 215, 315; Dec. Dig. §§ 136, 186.*]

8. MECHANICS' LIENS (§ 168*)—TIME OF COMMENCEMENT—BEGINNING OF WORK—PREPARATORY CLEARING AWAY OF RUINS OF FIRE—WORDS AND PHRASES—"VISIBLE COMMENCEMENT OF THE WORK UPON THE GROUND."

Under the Pennsylvania mechanic's lien law (Act June 4, 1901 [P. L. 437] § 13), which provides that such liens, in case of original construction, relate back and take effect "as of the date of the visible commencement upon the ground of the work of building the structure or other improvement," the mere delivery of materials on the ground or the tearing down of the ruins of a previous building destroyed by fire to clear the ground is not sufficient to fix the date of the lien, but so much must be done of a permanent character, as by the making of a substantial part of the excavation for foundations, as will apprise observers that a building is in progress.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 300; Dec. Dig. § 168.*]

9. RECEIVERS (§ 128*)—DISTRIBUTION OF FUNDS—MARSHALING OF LIENS—WAIVER OF PRIORITY BY SUPERIOR LIEN IN FAVOR OF AN INFERIOR.

That the holders of a mortgage, entitled to precedence over mechanics' liens, waived their right to priority in favor of receiver's certificates which were subsequent to such liens, does not entitle the mechanics' liens to priority of payment over the receiver's certificates from the proceeds of the property, where the fund for distribution is insufficient to pay the mortgage.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 219–222; Dec. Dig. § 128.*]

10. RECEIVERS (§ 128*)—CONFLICT OF DISTRIBUTION—WAIVER BY SUPERIOR IN FAVOR OF INFERIOR—PRIORITY AS BETWEEN RECEIVERS' CERTIFICATES, MECHANICS' LIENS, AND FIRST MORTGAGE.

In Pennsylvania, where the lien of the first creditor is superior to that of the second, but inferior to that of the third, and the lien of the second is superior to the third, the first creditor will take the fund because of his superiority to the second, by reason of the superiority of the second over the third. Where, therefore, a mechanic's lien was inferior to a first mortgage to secure a bond issue, and the right of bondholders were waived in favor of receivers' certificates made by order of court a first lien on the property, the fund, if not sufficient to satisfy the mortgage, will be awarded to the receivers' certificates.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 219–222; Dec. Dig. § 128.*]

In Equity. Suit by Pusey & Jones against Pennsylvania Paper Mills. On distribution of proceeds of foreclosure sale. Priorities of liens determined.

See, also, 163 Fed. 672; 173 Fed. 629.

S. B. Price, for receiver's certificate holders.
W. H. Rhawn, for first mortgage bond holders.
Sheldon Potter and C. W. Miller, for Newhall Engineering Co., mechanic's lien claimants.
R. O. Brockway, for Beach Haven Brick Co.
A. W. Duy, for the Commonwealth of Pennsylvania.
Harry S. Knight, for receiver.

ARCHBALD, District Judge. The amount realized by the foreclosure sale of the defendant's property was $35,600. The costs of sale, as fixed by the master's account, including local taxes paid, are $1,217.48, which leaves $34,382.52 to be distributed. Upon this, claim

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

is made for: (1) The unsettled expenses of the receivership; (2) taxes due to the commonwealth; (3) receiver's certificates; (4) mechanics'· liens of (a) the Newhall Engineering Company, and (b) the Beach Haven Brick Company; and (5) first mortgage bond holders. This more than exhausts the fund, and calls for a determination of the validity and order of priority of the different claims.

The unpaid expenses of the receivership, which preceded the foreclosure, as settled by the receiver's accounts, amount to $8,264.25, the items of which there appear. These expenses are ordered to be paid by the foreclosure decree as a preferred matter, next after the costs of sale and of suit, but are nevertheless contested by the receiver's certificate holders, on the ground that such certificates were made a first lien on the property, subject only to the rights of the mechanic's lien claimants—the lien of the first mortgage bond holders having been waived—and cannot now, as it is said, be disturbed. Assuming that the question is open, notwithstanding the foreclosure decree, as it clearly is not (Grant v. Insurance Co., 106 U. S. 429, 1 Sup. Ct. 414. 27 L. Ed. 237), there is no occasion to modify what is there adjudged. The court having taken the property into its hands to administer, by means of a receiver, may certainly provide for payment out of it of the costs of so managing and administering upon it, save only so far as this interferes with existing liens. It was by virtue of this that a loan of money on receiver's certificates was authorized, and the same power which entitled the court to order this and secure it by a lien on the property enables it also to take care of the expenses incurred outside of that, in the courts of the receivership, which in this respect stand no differently and are of equal obligation. If without power to order the one, it was without power to order the other, the contention of the receiver's certificates being self-destructive. It is said, however, that the court made the certificates a first lien on the property, and that, having contracted for this, it cannot afterwards let in anything to impair its own decree. But the court cannot bargain away its powers, if indeed it can be held to have done so. It is not like the attempt to give priority to receiver's certificates over vested or existing liens, with which, particularly in case of a private business corporation, it cannot of course interfere. By the order entered in the present instance, authorizing the issuing of $30,000 of receiver's certificates, to which the mortgage bond holders assented (the rights of mechanic's lien claimants who did not, being saved), the certificates were made a first lien on the property of the company, and, according to this, they will now be respected and enforced, but not to the prejudice of what it was found necessary to do in the interest of all parties concerned, including the certificate holders themselves, as called for by subsequent events. The court, in so pledging the property of the company, cannot be held to have tied its hands or stripped itself of authority to deal with it to this end. If that was not expressed in the order, it was implied. As said by Judge Jenkins, in Anderson v. Condict, 93 Fed. 349, 353, 35 C. C. A. 335, 339:

"It is not presumable that the court would divest itself of the power to pay the expenses of operations which it had assumed. · That would be an act of felo de se."

What, it may well be asked, would have become of the receiver's certificates, if it had so left them in the lurch? The priority given them by the order had relation to their standing with respect to other incumbrances, and was not with the idea of preferring them over administration expenses, subsequently incurred, which may therefore properly be first paid out of the proceeds of this sale, as provided in the foreclosure decree.

Four years' taxes were due to the commonwealth, on bonds and stock, at the time the receiver was appointed; and on June 15, 1908, an account was settled for them against the company, by the Auditor General, to the amount of $288, on which a statement of lien was entered, July 21, 1908, in the office of the prothonotary of the county, as provided by statute. These taxes became a lien from the time they were due, and are payable by law out of the proceeds of any judicial sale, in preference to any judgment, mortgage, or other claim on the property, even though entered before them. Act Pa. June 1, 1889, § 31 (P. L. 437). They are therefore payable now in advance of the mechanics' liens and receiver's certificates, and possibly also of the administration expenses, as to which, however, it is not necessary to express an opinion, there being enough in any event to take care of both. These taxes bear interest at 12 per cent. from 30 days after they were settled, which, calculated up to September 29, 1908, the day of sale, makes them amount altogether to $294.30.

The disposition of the rest of the fund depends on the validity and standing of the two mechanics' liens which have been mentioned. Both have been reduced to judgment, so that the amount on them is removed from controversy, the claim of the Newhall Engineering Company being fixed at $8,000, with interest from June 6, 1908; and that of the Beach Haven Brick Company at $225.50, with interest from July 24, 1908. Both are alleged to be defective in form, as well as filed too late, and in any event to be postponed to the first mortgage and the receiver's certificates. These questions depend on a number of considerations, and are not altogether easy of solution, calling, in consequence, for a somewhat extended discussion.

As just stated, the judgments recovered on the mechanics' liens are conclusive of the amount due on them, and so also are they of whether the work was done satisfactorily and in accordance with the contract, these being matters going to the merits, and concerning only the immediate parties. But whether the statement of lien conforms to the requirements of the statute, or was entered in time, and to what date, if any, it relates back, affect the character and standing of the lien, and are therefore open to inquiry. This is settled by a number of decisions, only one or two of which need to be referred to. Norris' Appeal, 30 Pa. 122; Safe Deposit Company v. Iron & Steel Co., 176 Pa. 536, 35 Atl. 229. Nowhere is the law better stated, except in one particular, than in Nolt v. Crow, 22 Pa. Super. Ct. 113, where the controversy was between a mechanic's lien on which judgment had been obtained, and an apparently earlier mortgage:

"Apart from the alleged delay in filing," as it is there said, "the principal ground on which the mechanic's lien is assailed is that the contract for the work, which embraced 86 buildings, was entire, and not divisible; that full performance has not been shown; and that without full performance there

can be no recovery or right to a lien. The measure of performance is a matter that concerns only the parties to the contract. The owner may waive any feature of it which is designed merely for his benefit. He may, for instance, waive delay in performing, failure to complete, or defects in the quality of the work or materials. It is sufficient if the claimant has done to the satisfaction of the owner anything for which the law gives a lien. He is not bound to perform his contract, nor is the owner required to hold him to it, merely to serve the purpose of those who are not parties to it. If other incumbrancers may impeach his lien on the ground of incompetent performance, they may with equal right impeach it for failure to perform within the stipulated time, or for defects in the work or materials. The owner may stand on the letter of the contract, and hold the claimant to its terms, if he so chooses, but strangers to the contract have no such right."

This is a clear and comprehensive statement of the law, the correctness of which is beyond dispute. The opinion, however, goes on to say:

"And whatever the right of other incumbrancers to contest the builder's right to a lien, while it remains in the form of a claim filed, it is barred by judgment on the claim. In the absence of fraud or collusion, such judgment is conclusive of the right to a lien. It is, however, conclusive only of this; it has no effect in fixing priority of lien, as against other incumbrancers, and is not even prima facie evidence of the matters essential to priority."

The conclusiveness of the judgment upon the right to a lien, which is so apparently upheld, was not necessary to the decision, which was only concerned with the right of other incumbrancers to question the right of the claimant to a lien, because the contract had not been performed, and that part of the opinion was repudiated upon this ground by the same court in the later case of Prudential Trust Co. v. Hildebrand, 34 Pa. Super. Ct. 249, where the right of such contesting creditors to inquire not only as to the matter of priority, but to go deeper and question the very validity of the lien, was asserted and maintained in its entirety. Everything is open, therefore, in the present instance, but the amount due and the matter of performance, and so far as necessary will be considered here.

Neither are the parties concluded by not invoking the remedy given by section 23, Act June 4, 1901 (P. L. 442), which is to be found in the margin.[1] It is true that the act of 1901 is supposed to afford a com-

[1] "Any party having a lien against, estate in, or charge upon the property included in such claim, may file his petition, under oath or affirmation, averring that the date mentioned in the claim as the time when the structure or other improvement was commenced is incorrect, or that the claim is filed against more land than should be justly included therein, or that for any reason the claim is postponed to the rights of the petitioner, and praying an appropriate decree; whereupon the court shall grant a rule upon such claimant to show cause why the relief prayed for should not be allowed, and shall stay proceedings on the claim pending the hearing of the rule, should justice so require. At the instance of others than those personally served with the scire facias, such rule shall be allowed, though judgment be recovered on the claim. The court shall from the pleadings, aided as to the material disputed facts, if any, by depositions, or by hearing at bar, make such order or decree as the facts shall warrant. Like proceedings shall be had if the petition shall aver that the claim is for any reason invalid, has been paid, waived or released, or should not legally or equitably be allowed as a claim against the property; but the material disputed facts in such cases, if any, shall at the request of either party, be tried by a jury without further pleadings. When such request is granted by the court, the fact thereof shall be entered on the judgment index as a lis pendens, with the same effect as if a writ of scire facias had duly issued upon said claim."

plete system in itself on the subject of mechanics' liens (Todd v. Gernert, 223 Pa. 103, 72 Atl. 249), and, all prior statutes having been repealed, to be in effect a new enactment. It is also true that, where a special remedy is provided by statute, it is, as a rule, exclusive; and that the right of any party interested to intervene, and have the judgment of the common pleas as to whether a mechanic's lien for any reason is invalid, is given by this section. There are considerations, however, by which it is to be regarded as cumulative and permissive, rather than exclusive, or at least that it is not binding in the present case. It has always been open to other lien creditors to contest on distribution the validity of a mechanic's lien, in form or substance. Thomas v. James, 7 Watts & S. (Pa.) 381; Lauman's Appeal, 8 Pa. 473; Knabb's Appeal, 10 Pa. 186, 51 Am. Dec. 472; Sicardi v. Keystone Oil Co., 149 Pa. 139, 24 Atl. 161, 163. And this right has been recognized and enforced, the same since the act as before it. Dunbar v. Washington Foundry, 210 Pa. 58, 59 Atl. 434; Prudential Trust Co. v. Hildebrand, 34 Pa. Super. Ct. 249. It was expressly declared indeed in the latter case that the section of the act in question had no effect upon it. A clear intent ought, therefore, to appear to substitute the one for the other, in order to have this provision of the act exclusive, which is not to be found in it. Where the right or the interest of a party, or the defense which he wishes to set up, can only be asserted with effect by intervening and being made a party to the lien or the proceedings upon it, as, for instance, when he seeks to strike down the lien on the merits, the statute no doubt must be followed; but not outside of that. A fund in court is still to be disposed of according to what is made to appear, which affects the standing and validity of such lien as respects other claimants. A lien void on its face, for example, is not to be enforced, merely because no steps have been taken in the common pleas to contest it; and it is particularly inappropriate where the contestants, as here, are receiver's certificate holders, whose lien was created by the order of this court, and who look to it to define and defend it, and who cannot be expected to submit to another court the matters upon which this depends.

The character of the structure, on account of which mechanics' liens are claimed, whether in effect a new building or merely an alteration or repair of an old one, is material, the statement of lien being required to conform to this, and being fatally defective, if filed for an original construction, where the work was merely by way of repair (Wharton v. Investment Co., 180 Pa. 168, 36 Atl. 725, 57 Am. St. Rep. 629); and in the latter case also, having to be filed within three instead of six months (Act 1901, § 10), and taking effect only from the date of filing (section 13). The facts by which its character here will be made to appear are as follows:

The plant of the Pennsylvania Paper Mills was an old one, having been in operation for a long period of years prior to the transactions in question, and consisted of a number of more or less separate buildings, located on a tract of land of about nine acres, at Catawissa, Pa., with a dam or pond adjoining, covering five acres more, by which it was supplied with water; all being essential and devoted to the one use of making paper pulp and paper. In 1902, the pulp mill, a frame

building at the rear of the boiler house, and containing the evaporator and incinerator, was destroyed by fire. The roof of the causticising plant, which was a part of the main building of the paper mill proper, was also destroyed, although the building itself, below the roof, was not injured; and neither was the building in which the digesters were installed, nor the place where the choppers were. While the operation of the plant was interfered with by the fire to a certain extent, the manufacture of paper at the paper mill proper was continued for about a year afterwards, and up to the time when the arrangement was made with the Newhall Engineering Company, July 3, 1903, for the rebuilding of the pulp mill. In rebuilding this mill, a change was made from ground wood pulp to soda pulp, and the plan of the mill was modified accordingly, being designed to embrace all the departments required in the manufacture of soda pulp—including a room where the logs were reduced to chips and screened; a digester room, in which the chips were cooked; a washhouse, in which, after being cooked, the pulp was washed, screened, and prepared for use in the paper mill; an evaporator room, in which the liquor was reduced sufficiently to be put into the incinerator; an incinerator room, in which the liquid was burned to a black ash; and an alkali or causticising room, in which the soda received its final preparation. There were two contemporaneous contracts made with the Newhall Company, by one of which they were engaged as engineers to furnish plans and estimates for the construction and equipment of the pulp mill and superintend the execution of the work on a commission basis, and, by the other, they were to make and supply at a specified price certain apparatus, of their own special designing, to go into the mill, consisting of an evaporator, with the necessary outfit, a causticising plant, and two wash tanks of a given capacity. These contracts were carried out, although not begun for a year afterwards, the paper mills company not being ready for it. The required buildings were designed, and their construction and equipment supervised, by the Newhall Engineering Company, and the specified apparatus supplied, the Pennsylvania Paper Mills Company furnishing the materials for the buildings and doing the work through an independent contractor. The work of rebuilding was begun the latter part of June or the first of July, 1904, and completed about January 1, 1905, the machinery which the Newhall people were to furnish being fully installed prior to April 1, following, and the whole plant being completed, and put in operation, making pulp, the latter part of that month, and so continuously operated from the spring of 1905 to the fall of 1906, when it was shut down for the purpose of making further changes.

In rebuilding the pulp mill, two things were sought to be effected: To adapt it to the use of jack pine, which could be obtained near at hand, and to give it a capacity of 15 tons of pulp daily. This was understood by the Newhall Engineering Company, and the designs which they made, and the machinery which they furnished, were supposed to have that in view, and to be effective for its accomplishment. The results secured, however, did not come up to expectations, and were in fact far from satisfactory. The mill could not be made to

turn out the desired amount, and changes were accordingly suggested to try and remedy it. Among these, two additional washers were supplied and put in by the Newhall people in August and September, 1905, being installed in a small building adjoining the washhouse, specially erected for the purpose; and four steel tanks, some two or three weeks later, which were set up in one end of the boiler house, a brick and frame building adjoining; and also an extra filter press, which was put in the latter part of November; besides other appliances made necessary in the same connection. Except for these changes, the work of the Newhall Engineering Company was complete in April, 1905. But on account of them, the representative whom they had on the ground to supervise the construction was not finally withdrawn until the next December.

The soda pulp mill, to which these observations apply, was entirely separate as a building, as well as a department, from the general paper mill establishment. While it adjoined the paper mill proper, there was no structural connection between them, and each could be operated independently of the other. The woodhouse, also, although connected operatively with the pulp mill, was a distinct building; while the incinerating, the causticising, the evaporating, and the digesting department, making up the pulp mill, were all under one roof, being simply separated by division walls between them.

There can be no question, upon this showing, that the work of erecting the soda pulp mill after the fire was not a mere matter of restoration or repair, but constituted an entirely new and substantial structure, for which a lien, upon that basis, directly lay. It was not confined to patching up or making good the inroads of the fire on a building the material portion of which remained intact. This may have been true as to the causticising department, the roof of which was burned, but not as to the pulp mill, of which the prior structure had been wiped out. While some small portion of the old wall was utilized, the work had practically to proceed from the foundation up. A whole new building, equipped with new and different machinery, and devoted to a different and distinct process, arose out of the ruins, which, although separate and apart from the paper mill proper, was necessary to the economical manufacture of paper at that plant, and for want of the successful operation of which the company in the end went down. The case is not like that of Porter v. Weightman, 29 Pa. Super. Ct. 488, where one section of a continuous building, composing a chemical factory was torn down and rebuilt. The work there was simply incorporated in the existing building, which could not be cut up, as it is said, for the purposes of lien. It was not, as here, where there was an entire new structure, not simply in its main mass, but from the ground up. The case is not one, therefore, calling for a lien for alterations and repairs, as argued. The lien was properly filed as for a new building, and is to that extent good.

The lien of the Newhall Engineering Company was also filed in time. There is no question with regard to that of the Beach Haven Brick Company. It is true that the pulp mill was completed and in running order as early as April or May, 1905, and that it was operated from that time on in connection with the rest of the paper plant; and

that the appliances put in afterwards were supplied by the Newhall people, in the effort to have it produce 15 tons of pulp a day, as promised and planned, which it never did. It is claimed, on the one hand, that the failure to accomplish this was due to the jack pine used, which was highly resinous, making the liquor viscid and refractory; and, on the other, that it was the fault of the apparatus, designed by the Newhall people, which would not work as it ought to; the appliances put in to remedy this not being effective to continue the lien, as it is contended. No doubt, after the completion and acceptance of a building, work done or material furnished to make good defects in the original construction will not extend the time within which a lien may be filed. Thoma and Blandy's Estate, 76 Pa. 30; McKelvy v. Jarvis, 87 Pa. 414; Homeopathic Association v. Harrison, 120 Pa. 28, 13 Atl. 501; Harrison v. Homeopathic Association, 134 Pa. 558, 19 Atl. 804, 19 Am. St. Rep. 714. And the same is true of additions and alterations, no part of the original plan, which are introduced to remedy imperfections therein. Diller v. Burger, 68 Pa. 432; Ryman's App., 124 Pa. 635, 17 Atl. 180; Collum v. Paint Co., 185 Pa. 411, 39 Atl. 1009. But that is not this case. The additions here were in line with the original plan to have a pulp mill of 15 tons daily capacity, and in order to try and bring it up to that. The jack pine was an experiment, and the Newhall people were not held responsible for the failure to get results out of it. It is not as though the extra appliances were by way of substitution for others which had been condemned and taken out because of imperfect construction. More of the same character were simply added, in order to increase the capacity of those already there, so as to take care, if possible, of the material which they had to deal with. It is true that these were furnished at cost, but not without at least that much charge, as though embraced in what had been previously put in, there being no adverse significance in this partial gratuity. As so viewed, the work was therefore a single whole, covered by the one engineering contract which bound together, from beginning to end, the different things done under it. Hofer's App., 116 Pa. 360, 9 Atl. 441. And it was so recognized by the immediate parties, the Newhall Company not being in a position to demand payment, nor the paper mills company to make settlement with them, until the last piece of machinery was furnished. And the lien, having been filed within six months afterwards, was in time, and, so far as that is concerned, is not open to question. It is said that the additional washers were installed in a small building adjoining the pulp mill, specially erected for the purpose, and that the four special tanks were similarly set up by themselves in one end of the boiler house, all being outside of the pulp mill, with which they had thus no immediate structural connection. But they were tied to it functionally as aids to the process carried on there, and, having been furnished in order to complete and perfect it, may therefore be properly regarded as continuing the work and preserving the right of lien until it was so brought to a conclusion.

Unfortunately, however, for the mechanics' liens, they should have been filed against the soda pulp mill by itself, and not against the entire

paper mill plant, as they are, and on this account they are fatally defective. It is clear from what has been already said that the pulp mill, while a part of the general establishment, and essential in a way to its successful operation, as a structure was distinct, capable of being separately liened, and bound to be so treated as to work done and materials furnished for and about its individual construction. And that both liens fail in that respect, there can be no question.

Taking up the Newhall lien first, the claim is declared to be "for the planning and superintending the construction of a soda pulp mill, consisting of a wash house, digester house, caustic house, incinerator house, and wood house, and planning and superintending the installation of machinery and apparatus for the soda pulp mill, and also furnishing machinery and apparatus" therefor. By direct averment, therefore, judged by the work claimed to have been so done, the right of lien was confined to the structure into which it went, and the property, against which it was laid, should have been restricted accordingly. This, however, is not the case. Quoting from the statement of lien, it is there said: "The following is a description of the property against which the lien is claimed: * * * All those two certain tracts of land situate in the borough and township of Catawissa, Columbia county, Pa.; one of them with the pulp and paper mill plants, being a soda pulp mill, consisting of a wash house, a digester house, a caustic house and incinerator house, a wood house, and also the paper mill, consisting of offices, a boiler house, a beater house, a paper machine room, a machine shop, and all other buildings and improvements thereon erected, and all machinery and fixtures of every kind therein contained, situate in said borough of Catawissa, bounded and described as follows:"—a full description of the tract being given by metes and bounds, and said to contain 9 acres and 39 perches; the second tract containing 5 acres and 13 perches, and forming the site of the dam or pond which furnished water to the works, being similarly set out at large. To this, as matter of description, both as to land and buildings, no exception can be taken. The only question is whether the claim of lien it not thereby carried outside of its legitimate bounds.

The lien given by the law to mechanics and materialmen, for work done and materials furnished for and about the erection and construction of a building or other improvement, is a lien on the particular structure into which such work and materials enter, and not, except by way of curtilage, to anything outside of that, such lien being conferred, by way of compensation, for that which is so directly contributed to it. "Every structure, or other improvement, and the curtilage appurtenant thereto," says the statute (Act June 4, 1901, § 2), "shall be subject to a lien," etc. And a substantial addition is put upon the same footing, such addition, and the structure of which it becomes a part, being made similarly subject (section 3). Parrish and Hazard's App., 83 Pa. 111. Where several buildings or improvements are constructed as a single manufacturing or business enterprise, such as an iron furnace, a salt works, an oil refinery, and the like, a lien may be filed against all, as constituting a single whole. Short v. Miller, 120 Pa. 470, 14 Atl. 374; Titusville Iron Works v. Keystone Oil Co., 130 Pa. 211, 18 Atl. 739; Linden Steel Co. v. Imperial Refining Co., 138

Pa. 10, 20 Atl. 867, 869, 9 L. R. A. 863; Sicardi v. Keystone Oil Co., 149 Pa. 139, 24 Atl. 161, 163; Linden Steel Co. v. Manufacturing Co., 159 Pa. 238, 27 Atl. 895; Premier Steel Co. v. McElwaine-Richards Co., 144 Ind. 614, 43 N. E. 876. But the fact that a building, upon its erection, becomes a part of a manufacturing establishment, does not extend the lien for materials furnished in its individual construction to all the buildings which make up the plant. Dalles Lumber Co. v. Wasco Manufacturing Co., 3 Or. 527. The lien in such case is limited to the particular building involved, and the claim of lien must be filed against it alone, and not against the entire premises, old buildings as well as new. Jones on Liens, §§ 1310, 1311; Wharton v. Douglas, 92 Pa. 66; Long v. McLanahan, 103 Pa. 537; Girard Storage Co. v. Southwark Co., 105 Pa. 248. And a statement of lien filed in disregard of this is necessarily and essentially bad. St. Clair Coal Co. v. Martz, 75 Pa. 384; Ely v. Wren, 90 Pa. 148. As said by Brown, J., in Todd v. Gernert, 223 Pa. 103, 72 Atl. 249, considering the present statute:

"A claim may be filed for labor or materials furnished to a 'structure,' but no permission is given to file a single one against several structures."

And it was accordingly held, in that case, that a lien could not be sustained against three separate dwellings in a row, upon the allegation that they formed one plant. Neither is the necessity for restricting the claim of the lien to the building involved affected by the provision of the statute (section 3) that the curtilage appurtenant to the structure or improvement may include other structures, whether newly erected, altered, or changed, forming part of a single business or residential plant. This is not a question of curtilage, but of extent and specification of lien, and the two are not to be confused. The structure controls the curtilage, which is confined in every instance to what is reasonably necessary for the purposes for which it was built. And the structure is therefore to be clearly indicated in the statement of lien filed, not only that the appropriate curtilage may be allowed, but also that other lien creditors may be advised to what extent in this, as well as in other directions, it is entitled to go. The lien extends primarily to the building, and only incidentally to the land. Wigton's App., 28 Pa. 161. And the statement of lien is to be correspondingly confined. Where it goes beyond this and includes other structures, against which there is no claim, it cannot stand. A claimant cannot enter a lien against several buildings, and expect to sustain it by showing a right of lien against one. The only question, therefore, in the present instance, is whether this was in fact done.

That the pulp mill was a separate and distinct structure there can be no doubt. This clearly appears from what has been already said, and is recognized also in the statement of lien. Not only is it there declared (paragraph 11), to be "a new erection and construction," but the different departments of which it was made up (paragraph 5) are described. It may be that the process to be carried on in it, as a matter of business, was indispensable to the economical manufacture of paper at the plant, and that, as already intimated, because of its unsuccessful operation, the company ended in the hands of a receiver.

And it may be also, in view of this, that the whole establishment, paper mill as well as pulp mill, could be regarded as the appropriate curtilage, being reasonably necessary for the purpose for which it was built. Section 3. It is also true, if this were found to be the case, that the specification of too large a curtilage would not vitiate the lien, it being within the power of the court, at any stage of the proceedings, to decide what was right. Harbach v. Kurth, 131 Pa. 177, 18 Atl. 1062; Sicardi v Keystone Oil Co., 149 Pa. 139, 24 Atl. 161, 163. But, as before said, this is not a matter of curtilage, but of lien, which has first to be disposed of before the other comes up. And the claim of lien here is clearly too broad, being made against the whole plant, and not against the pulp mill only, as it should have been. It is said that the eighth paragraph of the lien, on which this is predicated, which is quoted above, is merely concerned with a description of the property on which the pulp mill is situated, and was not intended to specify the structure against which the lien was filed, which is otherwise sufficiently indicated as the soda pulp mill, about which, according to the lien, the work was done. But the statute (Act April 17, 1905, P. L. 172), with which this paragraph of the lien evidently undertakes to comply, not only calls for a description of the real estate on which the structure is situated, but also for such a description of the structure itself as may be necessary for its identification; and the only description of that character, which we have here, includes all the buildings and improvements comprising the plant. Nor is this helped out by the final paragraph of the lien, where such curtilage is claimed as is reasonably necessary for the purposes of the pulp mill, against which, as it is said, the lien is filed. This is not the place, where parties interested are required to look for a designation of the structure liened; nor is a mere recital, such as this, enough to control the positive averment which had gone before. Even if it were more significant, however, than it is, if left in uncertainty between the two as to what structure is meant, the lien is bad, it not being for others to say which statement is to prevail. Mechanics' liens are secret liens, and must get on the record right, other lien creditors and purchasers being entitled to have something on which they can rely. But that it was beyond peradventure the intention to file the lien against the whole plant, the notice of lien, filed in supposed pursuance of the statute, gives the premises against which this was to be done, as the two tracts of land which have been referred to "with the pulp and paper mills plants thereon." The lien of the Newhall Company, therefore, being essentially claimed against the whole paper mill establishment, while entitled to be enforced against the soda pulp mill alone, for the construction and equipment of which the labor and materials were supplied, the statement of lien is fatally defective, and cannot be allowed.

The Beach Haven Brick Company's lien is, if possible, in even worse plight. Like the other, it is distinctly filed against the whole paper mill plant, made up of the two tracts of land described; the structure erected on the one, as it is said, being "a large brick paper manufacturing plant, consisting of a fiber mill, ground wood mill, and paper mill plant." There is thus no pretense of confining it to the pulp mill, into which the brick which were supplied went, a lien against the whole

property being unmistakably claimed, to which, under no circumstances, was there any right.

But assuming that these conclusions are not correct, and that the mechanics' liens are good as they stand, they are nevertheless not entitled to anything out of the fund. The difficulty is that the first mortgage is a superior lien, which relegates them to the rear, and lets in the receiver's certificates ahead, in favor of whom the bondholders waived their rights.

Mechanics' liens, in case of original construction, relate back and take effect, according to the statute (section 13), "as of the date of the visible commencement upon the ground of the work of building the structure or other improvement." This calls for something of such a marked and substantial character as to attract attention and convey notice that a new structure or improvement has been begun. 27 Cyc. 217. The mere placing of lumber or materials on the ground has been held not to be enough (Middletown Savings Bank v. Fellowes, 42 Conn. 36; Kansas Mort. Co. v. Weyerhaeuser, 48 Kan. 335, 29 Pac. 153), nor the staking out of the building or line of foundations (Kelly v. Rosenstock, 45 Md. 389; Hageman v. Fink, 19 Pa. Co. Ct. R. 660); contra, Lombaert v. Morris, 2 Del. Co. R. 457. Nor the clearing of the land of brush and stumps and putting it in a condition to begin work on the building proper. Central Trust Co. v. Cameron Iron and Coal Co. (C. C.) 47 Fed. 136 (Acheson and Reed, JJ.). And this excludes the demolition of a building, or the clearing away of the débris after a fire, being taken as the visible commencement of a new erection, unless it is more significant than it usually is. Neither is this otherwise, even though the contractor may have a lien for the demolition as a part of the construction contract, as in Whitford v. Newell, 2 Allen (Mass.) 424; Bruns v. Brann, 35 Mo. App. 337. Cf. McCristal v. Cochran, 147 Pa. 225, 23 Atl. 444; Craig v. Commercial Trust Co., 211 Pa. 7, 60 Atl. 317. Nor is it affected by the fact that the act of 1901 allows a lien for the removal of a building; which refers to the bodily transfer of it from one place, and the setting of it up in another, and has no application to the taking down of a structure to permit of a new one in its stead. The excavation for the foundation of the new structure is the accepted test of its commencement, to which mechanics' liens relate. Pennock v. Hoover, 5 Rawle (Pa.) 291; Moroney's App., 24 Pa. 377; Parrish and Hazard's App., 83 Pa. 111; Henning v. Fry, 23 Pitts. Leg. J. 125. And even this must have so far progressed as to be readily observed. A mere scratching of the ground is not enough. The suggestion that a mechanic's lien goes back to the first spade struck into the earth, or the first shovelful of dirt turned, is rhetorical but not sound. "The removal of the sod, the turning over of the soil, or such other equivocal acts as would not fairly indicate the purpose to build, do not constitute the commencement of the building. To satisfy the law, so much must be done of a permanent character as will apprise observers that building is in progress." Jacobus v. Mut. Ben. Life Ins. Co., 27 N. J. Eq. 604.

The only thing in the present instance to carry the mechanic's lien back of June 29, 1904, when the first mortgage was filed, is the evi-

dence that Gorry, the contractor for the construction of the pulp mill, did half a day's work on June 23, tearing down the back part of the mill ruined by the fire, and cleaning off the brick, preparatory to using them again. A couple of digesters had been delivered by the Newhall Engineering Company at that time, and were then on the ground. But that is all. The foundation trenches were not dug until later, and had not been started when Fegley went there, July 1, not having been staked out, according to Thomas Lynn, until July 4. And, confirmatory of this, it is testified by Schreuder, the representative of the Newhall Company, that the cleaning away of the débris was all that had been done when he came there, July 2. It is true that in a letter from Beckley, the president of the paper mills, to the Newhall Company, June 25, it is stated that the contractor had started in to clear away the old buildings preliminary to erecting the new, and that they were therefore to go ahead with their plans. But assuming that this was so, and that preparatory work of this character had been done, it does not make out that the work of rebuilding, within the meaning of the law, had been begun. Like the delivery of machinery or material on the ground, the mere cleaning up of the ruins of the fire did not necessarily import that the construction of a new building was going on. It was an equivocal act, entirely consistent with the mere repair or straightening up of the property, and therefore conveyed no such notice as was required. Until the excavation for the foundations was begun, there was thus, clearly, no visible commencement of the building on the ground, and, this not having been entered upon until after the first mortgage was filed, it was too late to affect the lien thereby acquired.

It is said, however, that, even if the mechanics' liens are postponed to the first mortgage, the receiver's certificates get no benefit from this, the waiver by the bondholders in their favor not being able to interfere with the mechanics' liens or to advance the receiver's certificates over their heads. It is no doubt true that the liens of the mechanics and materialmen, having attached to the property, could not be put aside in the interest of subsequent lien creditors, except by their own act. But that does not exactly present the case. Until the first mortgage has been satisfied, which the fund in court will not begin to do, the mechanic's lien claimants are not entitled to a dollar, and, as this is the necessary result if the mortgage is enforced, they have no possible interest in the distribution by which to come in. Nor does it give them any better standing that the bondholders have waived their rights in favor of the receiver's certificates, to which the mechanics' liens by themselves would be superior. The first mortgage stands as a complete bar to anything going to the mechanics' liens, which have no larger rights because, instead of taking it themselves, the bondholders have agreed to stand aside. In Wilcocks v. Waln, 10 Serg. & R. (Pa.) 380, a mortgage was superior to a judgment in favor of the United States, which became a preferred claim, as to everything else, by reason of the insolvency of the judgment debtor, and was therefore entitled to payment in advance of a judgment which was ahead of the mortgage. But it was held that the judgment of the United

States not being entitled to the money, as against the mortgage, and the mortgage being inferior to the judgment ahead of it, the situation was controlled by the position of the mortgage, and the fund was to be distributed in consequence to the prior judgment. As the United States could not take the money, it is said, it was nothing to them into whose hands it should go, when they were out of the field, the other competitors being left to fight it out between themselves. So in Manf. & Mech. Bank v. Bank of Pa., 7 Watts & S. (Pa.) 335, 42 Am. Dec. 240, there was a first mortgage which was bad as to subsequent judgments for want of record, but was good, by reason of notice, as to an intermediate second mortgage, and it was held that the first mortgage was entitled to payment in preference to the judgments. The latter could not come in, as it was pointed out, until the second mortgage was satisfied, which could not be until the satisfaction of the prior lien of the first mortgage, of which it had notice. The rule is thus given in Thomas' App., 69 Pa. 120:

"Where the lien of the first creditor is superior to that of the second, but inferior to that of the third, and the lien of the second is superior to the third, the first creditor will take the fund because of his superiority to the second, by reason of the superiority of the second over the third."

It is said, however, that the first place here is secured to the receiver's certificates by the agreement of the bondholders, and that Miller's App., 122 Pa. 95, 15 Atl. 672, is against the advancing of an inferior lien to a position of superiority in that way. But Miller's Appeal speaks of the difficulty, not the inability, of doing this. And the receiver's certificates were made a first lien on the property by the order of the court, and not by the consent of the bondholders alone. But however that may be, it all comes back, after all, to this, that, occupying a preferred place over the first mortgage as the receiver's certificates do, and the mechanics' liens being entitled to nothing until the first mortgage has been paid, the distribution of the fund is a question between the receiver's certificates and the first mortgage bond holders, with which the mechanics' liens have no concern.

Let a decree be drawn making distribution of the fund in accordance with the views so expressed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.